[No. D055549. Fourth Dist., Div. One. Sept. 7, 2010.]

ROBERT SANDELL, Plaintiff and Appellant, v.
TAYLOR-LISTUG, INC., Defendant and Respondent.

**COUNSEL**

Eisenberg & Associates, Michael B. Eisenberg and Joseph S. Socher for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, Charles A. Bird and Aaron T. Winn for Defendant and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

Plaintiff Robert Sandell appeals from a judgment entered after the court granted summary judgment in favor of defendant Taylor-Listug, Inc. (Taylor-Listug), on Sandell's claims for disability and age discrimination. Sandell was employed as vice-president of sales at Taylor-Listug, a guitar manufacturer, from 2004 to 2007.

Approximately six months into his employment at Taylor-Listug, Sandell suffered a stroke after receiving a chiropractic adjustment. Sandell returned to work at Taylor-Listug in late 2004. During the remainder of Sandell's employment at Taylor-Listug, he required a cane to walk, and his speech was noticeably slower than it had been prior to his stroke. Taylor-Listug's chief executive officer terminated Sandell's employment in late 2007, a few days after Sandell's 60th birthday, citing displeasure with Sandell's performance as vice president of sales.

The trial court concluded that there were no triable issues of fact with respect to Sandell's discrimination claims, and granted summary judgment in favor of Taylor-Listug. Having reviewed the record presented on summary judgment, we conclude that Sandell presented evidence sufficient to establish a prima facie case of disability and age discrimination, and in response to Taylor-Listug's proffer of legitimate nondiscriminatory reasons for terminating his employment, Sandell presented sufficient evidence to raise a triable issue of fact as to whether the motivation for his termination was discriminatory. We therefore reverse the judgment of the trial court and remand the matter for further proceedings.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*[1]

Taylor-Listug, also known as Taylor Guitars, is a manufacturer and wholesaler of acoustic guitars. Kurt Listug, one of the founders of Taylor-Listug, is chief executive officer of the company. Another founder, Robert Taylor, serves as the company's president.

Listug met Sandell at the National Association of Music Manufacturers convention in January 2004. Sandell had 30 years' experience in the music business. After inviting Sandell to interview at Taylor-Listug, Listug hired Sandell as senior vice-president of sales at the company. Sandell reported directly to Listug.

Listug hired Sandell, at least in part, because Sandell had experience with territory management, a practice that Taylor-Listug wanted to implement. As Listug explained, "Territory management . . . is tools for being able to set quotas by territory, region, town, et cetera. It has to do with looking at the buying power, you know, throughout the country and overlaying your sales targets over that, coming up with sales targets for your salespeople. [¶] [P]rior to [Sandell], none of us—none of the people in sales had any experience with that."

Sandell started working at Taylor-Listug in February 2004. In June 2004, Listug began a six-month sabbatical from his work at the company.

In August 2004, Sandell received a chiropractic adjustment from a chiropractor who was a friend of Taylor's, and with whom the company contracted to treat its employees. The following day, Sandell began to feel ill. Sandell's health continued to deteriorate throughout that day, and he eventually went to the hospital. A neurologist diagnosed Sandell as having suffered a stroke. According to Sandell, the neurologist said that she had seen other patients who had suffered a similar type of stroke after receiving chiropractic adjustments.

Sandell remained in the hospital for several weeks after the stroke, and then recuperated at home for several more weeks. Sandell returned to work on a part-time basis in October 2004. He was working full time by December 2004.

---

[1] We base our factual background primarily on the facts that the parties set forth in their separate statements of facts filed in the trial court, and the evidence cited therein. (See *Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1489 [35 Cal.Rptr.3d 596].)

After the stroke, Sandell had difficulty with his balance and strength, and also had difficulty talking. Because of his balance problems, Sandell needed a cane to walk when he returned to work. His speech was also noticeably slower than it had been prior to the stroke.

Sandell testified in his deposition that not long after he returned to work, "[Listug] came in my office . . . and closed the door and said that if I didn't make a full recovery, that the company had the right to fire me or demote me and reduce my salary." Sandell also said that Listug questioned Sandell's use of a cane, suggesting that Sandell was using the cane to create sympathy or to get attention: "[Listug] called me to his office after one of our regular or routine sales meetings, and he asked me when I was going to get rid of the cane and when I was going to drop the dramatization." Listug also told Sandell that he wanted Sandell to "be more of a cheerleader type of personality in the sales department." Sandell testified that this is not what Listug had told Sandell when Sandell started his job at Taylor-Listug, but rather that Listug's desire for more of a "cheerleader type" had apparently developed sometime later.

The parties disagree as to the meaning of the data pertaining to Taylor-Listug's guitar sales during Sandell's tenure as vice-president of sales. However, it is undisputed that in 2004—a year during which both Sandell and Listug spent significant periods of time not working—sales of Taylor-Listug guitars decreased for the first time in 20 years. Taylor-Listug's total sales increased in 2005, may have decreased in 2006, and increased again in 2007.[2] Taylor-Listug cites various statistics related to these numbers to argue that Sandell's sales management was ineffective. Sandell responds by noting that during his years at Taylor-Listug, the company's market share increased in a number of key markets, and that although the company did not see overwhelming sales growth during that period, the market for guitars, in general, suffered. Sandell presented evidence that, according to data from the Guitar and Accessories Marketing Association, sales growth in the guitar market slowed dramatically from 2004 to 2005, and decreased significantly in both 2006 and 2007. Sandell argues that when viewed in the context of a slowing overall market, Taylor-Listug's sales numbers were actually quite good.

Sandell also presented evidence that he introduced new practices to the Taylor-Listug sales department, such as analyzing each sales area's buying

---

[2] The evidence concerning Taylor-Listug's sales in 2006 is ambiguous. Although data collected by Guitar Accessories Marketing Association indicates that Taylor-Listug's sales numbers decreased between 2005 and 2006, Sandell's performance review for 2006 indicates that "[s]ales grew approximately 6.9% in a market where imports were down 16% and retail sales of acoustic guitars were down by several percentage points according to Music Trades magazine."

power index in order to determine how many sales the company should expect from a particular sales area. Other practices that Sandell initiated at Taylor-Listug included regular territory reviews with each area's account manager; a new incentive program for sales staff to encourage growth; a "minimum advertised price" policy, pursuant to which dealers would not be permitted to advertise Taylor-Listug products below a certain price set by Taylor-Listug; and increased travel expectations of sales staff pursuant to which sales personnel would visit the dealers in person for approximately two weeks per month, rather than relying on telephone contact, as had been the practice prior to Sandell's arrival.

During his employment at Taylor-Listug, Sandell received three annual reviews—one in 2004, another in 2005, and a third in 2006. The Taylor-Listug performance review document includes 13 sections, or areas for review. For each of the first eight areas of review, the document asks the employee to rate himself in that area by marking a box next to "Must Improve," "Meets Requirements," and/or "Exceeds Requirements." Under these boxes, the form provides space for the employee to provide written comments to explain his or her self-evaluation. Under the employee's comments for each section, the supervisor is asked to rate the employee on the same scale, and to provide comments explaining the rating given. The final five sections—"Strengths," "Weaknesses," "Challenges to overcome (how can I do a better job and provide more value)," "Goals for next period," and "Overall Comments,"—do not ask for a rating, but, rather, simply provide space for written comments by both the employee and the supervisor.

Sandell's written evaluation for 2004 indicated that Sandell was meeting or exceeding requirements in all of the areas in which he was reviewed, with the exception of one area entitled "Results." In that area, Listug noted "Must Improve." However, in his comments under this section, Listug indicated that he felt he "[had] to say" that because sales had declined that year, for the first time in 20 years. Listug also took some of the blame for the poor sales by noting that Sandell had come into a sales department that was "in some turmoil" after the departure of the previous vice-president of sales. Listug indicated in his comments that Sandell had already introduced helpful new approaches for the sales department.

Sandell's 2005 review indicated that Sandell was meeting requirements across the board, and that he was exceeding requirements in some areas. However, in the written comments associated with some of the areas of review, Listug indicated some subjective concerns. For example, Listug said that while he agreed with Sandell's self-evaluation regarding his "Attitude," Listug "sure would like to see more enthusiasm from Robert." Listug added, "He frequently seems bored, or he at least comes across that way. It would be nice if Robert were more outgoing and friendly."

In 2006, Listug rated Sandell's performance as meeting requirements in three areas. In three other areas, Listug rated Sandell's performance as needing improvement. For the final two areas of review, Listug marked both the "Must Improve" and "Meets Requirements" boxes. Listug also gave Sandell both positive and negative reviews on other subjective criteria. For example, under the area entitled "Teamwork," Listug states, "Robert has a stable good attitude. He usually has good constructive feedback or input. He's easy to work with, and doesn't politic. In this sense, he's earned the trust of others. However, he does not provide enough leadership or drive to have the level of respect he should for the position he has."

Under the portion of the review sheet where Listug was to identify Sandell's "Weaknesses," Listug wrote, "Robert does not have the drive that this position requires. . . . Maybe he's never had to actually lead sales in other companies he's worked for, or inspire people to perform at a higher level, or put the fear of God in them if they don't. But he does not put anywhere near the amount of passion, life, energy or drive into leading sales." Under "Goals for next period," Listug indicated that he wanted Sandell to "[l]ead and manage [his] staff with [his] emotion and personality, and with inspiration and life." Below that, however, in the "Overall Comments" section, Listug wrote, "Robert's a good man, and he's contributed positively to the company. He's provided stability to the sales area that was lacking. The sales staff like interacting with him, and respect his opinion and his experience. He's generally on top of what is happening in sales."

Sandell turned 60 years old in October 2007. A few days later, on October 31, 2007, Taylor-Listug terminated Sandell's employment. Listug made the decision to fire Sandell. According to Listug, his "primary frustration with Sandell was his lack of leadership in providing direction to the sales team and in producing satisfactory sales results."

B. *Procedural background*

Sandell filed a complaint against Taylor-Listug on May 29, 2008. In his complaint, Sandell alleged two causes of action under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.)— disability discrimination and age discrimination.

On February 20, 2009, Taylor-Listug filed a motion for summary judgment. After full briefing on the motion, on May 7, 2009, the trial court issued a tentative ruling granting Taylor-Listug's motion in full. The court held a hearing on May 8, and after hearing oral argument on the motion, adopted its tentative order as the final order of the court.

The court entered judgment in favor of Taylor-Listug on May 20, 2009. Counsel for Taylor-Listug filed a notice of entry of judgment on May 29. Sandell filed a timely notice of appeal on July 9, 2009.

## III.

## DISCUSSION

### A. *Legal standards*

#### 1. *Standards applicable to discrimination claims*

■ "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).) ■ California has adopted the three-stage burden-shifting test for discrimination claims set forth in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 [36 L.Ed.2d 668, 93 S.Ct. 1817]. (*Guz, supra,* 24 Cal.4th at pp. 354–356.) "This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra,* 24 Cal.4th at p. 354; see also *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1317 [237 Cal.Rptr. 884] ["In most cases, the complainant will be unable to produce direct evidence of the employer's intent. Consequently certain rules regarding the allocation of burdens and order of presentation of proof have developed in order to achieve a fair determination of 'the elusive factual question of intentional discrimination.' [Citation.]"].)

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled. [Citations.]" (*Guz, supra,* 24 Cal.4th at pp. 354–355.)

"If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises. [Citations.]" (*Guz, supra,* 24 Cal.4th at p. 355.) "Accordingly, at this trial stage, the burden shifts to the employer to rebut the

presumption by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason. [Citations.]" (*Id.* at pp. 355–356.)

"If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias. [Citations.]" (*Guz, supra,* 24 Cal.4th at p. 356.)

### 2. Summary judgment standards

"Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. [Citation.] On appeal, the reviewing court makes ' "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]" ' [Citations.]" (*Hesperia Citizens for Responsible Development v. City of Hesperia* (2007) 151 Cal.App.4th 653, 658 [60 Cal.Rptr.3d 124].)

In independently examining the record on appeal "to determine whether triable issues of material fact exist," we " 'consider[] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' [Citations.]" (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1530 [53 Cal.Rptr.3d 700].) Further, " 'we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [the plaintiff's] evidentiary submission while strictly scrutinizing the defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor.' [Citation.]" (*Ibid.*)

" 'In the summary judgment context . . . the evidence must be incapable of supporting a judgment for the losing party in order to validate the summary judgment.' " (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 877 [58 Cal.Rptr.3d 729] (*Faust*).) " 'Thus even though it may appear that a trial court took a "reasonable" view of the evidence, a summary judgment cannot properly be affirmed unless a contrary view would be unreasonable as a matter of law in the circumstances presented.' [Citation.]" (*Ibid.*)

### 3. Summary judgment in the context of a discrimination claim

 " '[W]e must keep in mind that the *McDonnell Douglas* test was originally developed for use at trial [citation], not in summary judgment proceedings. "In such pretrial [motion] proceedings, the trial court will be called upon to decide if the plaintiff has met his or her burden of establishing a prima facie case of unlawful discrimination. If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.* In short, by applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, 'the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury.' " . . . Thus, " '[a]lthough the burden of proof in a [discrimination] action claiming an unjustifiable [termination] ultimately rests with the plaintiff . . . , in the case of a motion for summary judgment or summary issue adjudication, *the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. . . .* In other words, the burden is reversed in the case of a summary issue adjudication or summary judgment motion. . . .' " ' [Citation.]" (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 343–344 [77 Cal.Rptr.3d 654], second italics added.)

" 'Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. These include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . .' [Citation.]" (*Guz, supra,* 24 Cal.4th at p. 362.)

### B. The trial court erred in summarily adjudicating Sandell's disability discrimination claim

The trial court concluded that Sandell failed to present a prima facie case of disability discrimination. The court further concluded that even if Sandell had sufficiently made out a prima facie case of discrimination, Taylor-Listug had produced evidence demonstrating that it terminated Sandell's employment for a legitimate business reason, and that Sandell failed to present evidence in response showing that the reason that Taylor-Listug offered for his termination was a pretext for discrimination. We conclude that in ruling on Taylor-Listug's summary judgment motion, the trial court failed to view the evidence in the light most favorable to Sandell and misapplied the law,

causing it to reach the erroneous conclusion that summary adjudication of this claim was appropriate.[3]

### 1. *Legal standards for a FEHA disability discrimination claim*

■ FEHA prohibits employment discrimination based on a physical disability. (Gov. Code, § 12940, subd. (a).) ■ The Legislature has made it clear that FEHA's statutory provisions are to be interpreted broadly. "The law of this state contains broad definitions of physical disability, mental disability, and medical condition. It is the intent of the Legislature that the definitions of physical disability and mental disability be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling." (Gov. Code, § 12926.1, subd. (b); see also Gov. Code, § 12993, subd. (a) ["The provisions of [FEHA] shall be construed liberally for the accomplishment of [its] purposes . . ."].)

■ In the context of disability discrimination, the plaintiff initially has the burden to establish a prima facie case of discrimination. The plaintiff can meet this burden by presenting evidence that demonstrates, even circumstantially or by inference, that he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability. (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 254 [102 Cal.Rptr.2d 55].) To establish a prima facie case, a plaintiff must show " ' " 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a [prohibited] discriminatory criterion . . . .' " ' [Citation.]" (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2 [113 Cal.Rptr.3d 327, 235 P.3d 988] (*Reid*).) The prima facie burden is light; the evidence necessary to sustain the burden is minimal. (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1751 [52 Cal.Rptr.2d 620].) As noted above, while the elements of a plaintiff's prima facie case can vary considerably, generally an employee need only offer sufficient circumstantial evidence to give rise to a reasonable *inference* of discrimination. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1002 [67 Cal.Rptr.2d 483] (*Hersant*) [explaining nature of prima facie case in context of age discrimination].)

---

[3] Because this is an appeal from a grant of a motion for summary judgment, we must view the evidence in the light most favorable to Sandell, the nonmoving party. We do not intend to suggest that, at trial, a fact finder should or will weigh this evidence and draw the same inferences that we raise in this opinion. Rather, we simply conclude that a fact finder could reasonably draw such inferences. The same is true with respect to our conclusion as to Sandell's age discrimination claim.

### 2. *Sandell presented a prima facie case of disability discrimination*[4]

#### a. *Sandell presented evidence that he is "disabled" under FEHA*

█ Under FEHA, a person is "physically disabled" when he or she has a physiological condition that "[*l*]*imits* a major life activity." (Gov. Code, § 12926, subd. (k)(1)(B), italics added.)[5] "[A] qualifying disease or condition 'limits a major life activity if it makes the achievement' of the activity 'difficult.' [Citation.]" (*Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1027 [130 Cal.Rptr.2d 662, 63 P.3d 220], fn. omitted (*Colmenares*).) " 'Limits' shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity." (Gov. Code, § 12926, subd. (k)(1)(B)(i).)

It is clear that walking is a major life activity under FEHA. (Cal. Code Regs., tit. 2, § 7293.6, subd. (e)(1)(A)(2)(a) [" 'Major Life Activities' are functions such as caring for one's self, performing manual tasks, *walking*, seeing, hearing, speaking, breathing, learning, and working." (italics added)].) Sandell presented abundant evidence that his ability to walk after his stroke was impaired, and that from the time of his stroke to the time Taylor-Listug terminated his employment, he required a cane as an assistive device. Sandell thus presented sufficient evidence to demonstrate that he was limited in his ability to walk—a major life activity—and, therefore, that he suffered from a disability at the time his employment was terminated.

█ Despite the fact that it is undisputed that Sandell required a cane to walk, Taylor-Listug nevertheless argues that Sandell failed to establish that he is disabled.[6] We disagree. At a minimum, evidence that an individual requires a cane in order to walk is clearly sufficient to establish that a person is physically disabled under California law.

---

[4] Taylor-Listug does not dispute that Sandell demonstrated that he was qualified to perform the essential functions of the job, thereby meeting the second element of the prima facie test. We therefore do not address the evidence related to that element.

[5] In contrast, federal law requires that a disability "*substantially limit*[] one or more major life activities" of an individual. (42 U.S.C. § 12102(1)(A), italics added; see 29 C.F.R. § 1630.2(g)(1) (2010).)

[6] Taylor-Listug was able to convince the trial court that Sandell failed to make out a prima facie case that he was disabled at the time Taylor-Listug terminated his employment. According to the trial court, because Sandell testified "that no stroke-related medical issues kept him from doing his work at Taylor Guitars," and because he took no medicine, and was able to perform his work at normal capacity once he returned to work full time, Sandell could not establish that he had a disability at the time Taylor-Listug terminated his employment.

Whether Sandell could perform his work at normal capacity is not relevant to Sandell's particular claim of disability discrimination. In reaching its conclusion, the trial court appears to have applied the legal standards that pertain to a claim of failure to accommodate a disability. However, Sandell has not alleged that Taylor-Listug failed to accommodate his

Taylor-Listug cites *McDonald v. Coldwell Banker* (9th Cir. 2008) 543 F.3d 498, 505, fn. 6 (*McDonald*), in support of its position that "while Sandell's condition may have affected his gait, he was not disabled." In dictum, the *McDonald* court stated: "It should be noted that McDonald, who asserts disability by virtue of her use of a walking cane, has not produced any evidence of being disabled within the meaning of the Unruh Act, which requires any 'physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does *both* of the following: (A) [a]ffects one or more of the following body systems: neurological, immunological, musculoskeletal, . . . and (B) [l]imits *a major life activity*.' See Cal. Gov. Code § 12926 (k)(1)(A)–(B) . . . . The only evidence of disability presented by McDonald is that she uses a cane; this, alone, does not establish that a 'major life activity' has been limited. See 42 U.S.C. § 12102; see also *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 564–66 [144 L.Ed.2d 518, 119 S.Ct. 2162] (1999) (holding that to be 'disabled' under the Americans with Disability Act ('ADA') one must have 'limitations that are in fact substantial' and because every determination of whether an individual is disabled is 'case-by-case,' particularized evidence is needed)." (*McDonald, supra*, 543 F.3d at p. 505, fn. 6, italics added & omitted.)

The *McDonald* court did not, in our view, properly interpret California law on the subject of the meaning of "disability" under FEHA. Although the *McDonald* court believed that it was applying the provisions of FEHA in rejecting a plaintiff's use of a cane as evidencing a disability, that court incorrectly relied on federal legal standards in reaching this conclusion. As noted above, California law and federal law differ with respect to the standard for establishing a disability, in that federal law requires a showing of a "substantial limitation," while FEHA requires only that the condition "limits" a major life activity. (*Colmenares, supra*, 29 Cal.4th at pp. 1025–1027, 1030 ["[A] physical disability under the FEHA does *not* require the federal test's *substantial limitation* of a major life activity. [Citation.] . . . [T]he FEHA's test [is] 'limits,' not substantial limits."].) We therefore reject the *McDonald* court's conclusion that evidence of the use of a cane by one asserting disability discrimination is necessarily insufficient to demonstrate that he or she suffers from a "disability" under California law. One could reasonably infer from evidence that a person uses a cane to walk that he *needs* the cane to walk, and is therefore limited with respect to a major life activity, as defined under FEHA.

---

disability. Rather, Sandell alleges that Taylor-Listug was motivated to terminate his employment because he was disabled. In order to prove this claim, Sandell need show only that he was disabled, a fact that is distinct from whether he could perform his job without accommodation.

In addition to evidence concerning Sandell's need to use a cane, Sandell also presented evidence that his speech was impaired as a result of his stroke. Speaking, like walking, is deemed to be a major life activity under California law. (Cal. Code Regs., tit. 2, § 7293.6, subd. (e)(1)(A)(2)(a).) Taylor-Listug's only response to Sandell's evidence regarding his impaired speech is its contention that "[e]ven though Sandell may have spoken with a more deliberate pace, his condition did not limit his ability to speak."[7] However, the evidence is clearly sufficient for a fact finder to conclude that Sandell's stroke caused him to have difficulty speaking, and that he was thus limited in this major life activity, as well.

> b. *Sandell presented evidence sufficient to make a prima facie case that Taylor-Listug terminated his employment because of his disability*

Taylor-Listug contends that "Sandell's alleged disability was not known to Taylor Guitars," and that Sandell therefore cannot show that he was terminated " 'because of' a disability." In making this assertion, Taylor-Listug misconstrues both the law and the evidence.

There is abundant evidence that virtually everyone who worked with Sandell was aware that he often used a cane to walk. In deposition testimony, Listug and Taylor both admitted having seen Sandell walk with a cane during his employment at Taylor-Listug. For example, Listug was asked, "[O]ver the rest of Mr. Sandell's employment at Taylor, did he continue to often use a cane?" Listug responded, "Yes. I often saw him using a cane." Listug also stated, "[G]enerally speaking he seemed a little bit slower [after the stroke]," and "more often than not when I saw him he was using a cane."[8]

There is also evidence in the record that Sandell's speech was impaired after his stroke, and that Sandell's coworkers and his supervisor at Taylor-Listug were aware of his speech impairment. Listug acknowledged during his deposition that he noticed that Sandell was talking a little bit more slowly after the stroke. Richard Fagan, a former regional sales manager and national sales manager at Taylor-Listug who had worked under both Sandell and Sandell's successor before Fagan, himself, was let go, testified that after the

---

[7] Taylor-Listug also argues that Sandell's speech impairment "did not limit his ability to perform his job." Again, although work is a major life activity, FEHA does not require that an individual demonstrate that his physiological condition limits his ability to work in order to be considered "disabled." Rather, that person need show only that his physiological condition limits *a* major life activity.

[8] Despite this admission, Listug claimed in a declaration submitted in support of Taylor-Listug's motion for summary judgment that at the time he decided to terminate Sandell's employment, he "was wholly unaware that [Sandell] suffered from any type of physical disability."

stroke, Sandell spoke more slowly than he had previously, and that although Sandell's speech improved over time, it did not return to the way it had been before the stroke prior to the time Taylor-Listug terminated Sandell's employment.[9]

Viewing this evidence in the light most favorable to Sandell, a fact finder could reasonably conclude that Taylor-Listug was aware that Sandell was disabled within the meaning of FEHA. We therefore reject Taylor-Listug's contention that Sandell cannot demonstrate that he was terminated because of his disability on the ground that Taylor-Listug was not aware of his disability.

> 3. *Sandell presented sufficient evidence to support his claim for discrimination in response to Taylor-Listug's proffer of nondiscriminatory reasons for terminating his employment*

■ Once the employer has offered a legitimate, nondiscriminatory reason for the adverse employment action, a " 'plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated. [Citation.]' [Citation.]" (*Faust, supra,* 150 Cal.App.4th at p. 886.) In demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, " '[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," . . . and hence infer "that the employer did not act for the [asserted] non-discriminatory reasons." [Citations.]' [Citations.]" (*Hersant, supra,* 57 Cal.App.4th at p. 1005, citations & italics omitted.)

---

[9] Although this does not constitute direct evidence that the individuals who made the decision to fire Sandell were aware of Sandell's speech impairment, one could reasonably infer from this evidence that those who worked with Sandell, including Listug and Taylor, were aware that Sandell's ability to speak continued to be negatively affected by his stroke throughout his employment at Taylor-Listug. Again, because this is a motion for summary judgment, we must view the evidence in the light most favorable to Sandell, the nonmoving party. We are not suggesting that, at trial, a fact finder should or will weigh this evidence and draw this particular inference. Rather, we simply conclude that a fact finder could reasonably draw such an inference.

### a. *Sandell offered evidence that Taylor-Listug's proffered reasons for terminating his employment were untrue, from which a fact finder could infer that those reasons were a pretext for disability discrimination*

Taylor-Listug contends that it terminated Sandell's employment for performance-related issues. For example, Taylor-Listug contends that during Sandell's tenure, "sales never met Listug's expectations, the sales team complained that they received no direction from Sandell, and employees throughout the company complained that Sandell would not respond to their messages." Taylor-Listug also argues that Sandell did not lead his sales team in the manner that Listug wanted, and that Sandell also failed to meet with dealers one-on-one.

Sandell presents evidence that places in dispute the validity of the reasons that Taylor-Listug offers for its termination of Sandell's employment. For example, Taylor-Listug broadly asserts that "all of [Sandell's] performance evaluations document multiple problems and concerns." However, a review of the record does not support this assertion.

Sandell's first performance review, in January 2005, for the 2004 review period, shows that Listug rated Sandell's performance as "[m]eet[ing] [r]e-quirements" or "[e]xceed[ing] [r]equirements" in all areas except one. In that one area, entitled "Results," Listug noted that Sandell's performance "[m]ust [i]mprove." However, Listug's contemporaneous comments about this rating are telling: "I have to say 'must improve', because the company's sales declined in 2004 for the first time in more than 20 years. I can't in all honesty say this 'meets requirements.' [¶] Robert did accomplish the above [(i.e., the positive results that Sandell had listed in his own review of his perfor-mance)]. He came into a difficult situation, with [the prior vice-president of sales] having just been terminated, and the sales department in some turmoil. He did a very good job of gaining people's trust, and was cognizant of not changing things that have been working. [¶] The territory quotas and MSA/BPI approach have been very helpful, and the territory reviews have become more thorough than they were before Robert joined us."

Sandell had been working at Taylor-Listug for only approximately six months before he suffered a stroke, and was not back working full time until December of that year. This fact, considered in the context of Listug's comment that the sales department had been "in some turmoil," prior to

Sandell's hiring, and evidence that Listug, himself, took a six-month sabbatical beginning in June 2004, could lead a reasonable fact finder to conclude that Listug's "Must Improve" rating, and the lagging sales figures that year, were attributable to forces outside of Sandell's control and unrelated to his actual performance as vice-president of sales. Further, one could reasonably conclude that this performance review was, overall, quite positive.

Listug rated Sandell's performance as "Meet[ing] Requirements" across the board in his 2005 review. It was only in Sandell's third and final performance review that Listug indicated that Sandell's performance "Must Improve" in three of the eight performance areas.[10] Further, in light of the fact that Listug's complaints about Sandell's performance were often subjective, one could reasonably infer that these complaints, and the negative performance evaluation, were themselves motivated by discriminatory animus.

Sandell presented other evidence that further calls into question the validity of Taylor-Listug's contention that Sandell did not meet legitimate expectations. Although Taylor-Listug's sales decreased for the first time in 20 years in 2004, the first year of Sandell's tenure, there is evidence demonstrating that Taylor-Listug was able to avoid the significant decreases in sales that the overall guitar market suffered during the time Sandell was vice-president of sales, and that Sandell actually helped the company continue to increase its sales in a market that declined approximately 24 percent between 2004 and 2007. In addition, under Sandell's watch, Taylor-Listug's export sales increased significantly, from approximately $6 million in 2005, to close to $10 million in 2007—an increase of 66 percent over two years. Further, between 2004 and 2006, Taylor-Listug's total guitar revenue rose from approximately $52.5 million to approximately $57.8 million, a 10 percent increase, and its total revenue increased from approximately $52 million to $59.9 million, a 15 percent increase.[11]

With respect to Taylor-Listug's contention that members of the sales team complained about Sandell's lack of leadership and his failure to maintain e-mail communication, Taylor-Listug cites, in part, to the declarations of

---

[10] Listug rated Sandell as "Meet[ing] Requirements," in three other areas. In two of the performance areas, Listug marked both the "Must Improve" and "Meets Requirements" boxes.

[11] Taylor-Listug disputes the relevance of this fact, arguing that it is "immaterial in light of the undisputed fact that Taylor Guitars' net income in 2007 was cut nearly in half [from the previous year's net income]." However, it is unclear from the evidence what caused this decrease in "net income." Taylor-Listug did not present any evidence from which one could conclude that the decrease in "net income," despite an increase in overall revenue, was attributable to Sandell's actions or inactions, as opposed to the actions of other decision makers within the company.

Thomas Watters, Diane Magagna, and David Hager to support its claim. Watters, who was a regional sales manager under Sandell, stated in his declaration, "I would characterize [Sandell's] leadership of the sales team as non-existent. He provided little guidance to me and did not appear to have a business plan or any defined sales strategy. . . . [¶] Sandell was not very responsive to my e-mail or phone messages." However, Watters testified at his deposition that although he "sometimes . . . felt like Mr. Sandell was not so responsive to some of [his] e-mail questions," Watters never discussed this issue with anyone in management at Taylor-Listug. Nor did he ever express his opinion to anybody at Taylor-Listug that Sandell did not exercise leadership over the sales team or that Sandell's method was not the method that Watters would have used.

David Hager, another regional sales manager who worked under Sandell, stated in his declaration, "In my opinion Sandell was not a leader. He was not a driving force, but more of a data analyst. In talking to other employees, I discovered that this was a common opinion shared by many people who worked on Sandell's sales team. Everyone in sales seemed to be frustrated with Sandell's lack of leadership." However, Hager testified during his deposition that he did not recall ever speaking to Shaun Paluczak, the director of human resources, "about Mr. Sandell's performance or his interactions with [Hager] as VP of sales." When asked whether he ever spoke with Listug about Sandell, Hager testified that although he would send his "ideas and strategies and thoughts" directly to Listug, he "wouldn't necessarily speak negatively of someone else." Similarly, during her deposition, Magagna testified that "we all were aware that [Sandell] didn't answer e-mails sometimes, and that just was Robert." However, when asked if she recalled having discussed this issue with Listug or Taylor, Magagna replied, "Never."

Thus, while Taylor-Listug presented evidence that a number of Taylor-Listug employees *currently* claim that they had complaints about Sandell's leadership, the evidence further demonstrated that none of these employees ever brought these complaints to the attention of either Taylor or Listug while Sandell was working for the company. A reasonable person could therefore infer that at the time the decision to terminate Sandell was made, Taylor-Listug's decision makers did not have the kind of feedback about Sandell's performance that they now suggest was the impetus for terminating his employment.

Sandell also offered Fagan's testimony concerning all of the positive things that Sandell did in his position as vice-president of sales. These included

instituting a requirement that sales people "get out there and see our customers more" and "get out into the stores . . . two weeks out of the month," as well as implementing a "buying power index and an MSA, which is how much business a certain Metropolitan area should be doing." According to Fagan, Sandell participated in weekly meetings with the sales staff, at which he contributed new ideas, encouraged others to offer their ideas, and came up with ways to improve those ideas.

Fagan testified that he never "ha[d] any complaints about Mr. Sandell's performance that [he] discussed with anyone at Taylor while [he was] working there." Fagan also noted that he could recall only two individuals who worked in the sales department whom he had ever heard complain about Sandell, one of whom was Hager. In addition, Fagan testified that although Sandell may not have been "the quickest at e-mail," Sandell "always had an open-door policy," and Fagan told his sales managers that they could always come talk to Sandell in person if they needed something. Fagan also explained that if Sandell did not promptly respond regarding something that Fagan needed to know quickly, it was usually because Sandell had been "in a meeting or doing something else."

With respect to Taylor-Listug's contention that Sandell failed to meet with dealers one-on-one, Sandell testified that during his tenure at Taylor-Listug, he interacted with his contact at Guitar Center, Taylor-Listug's biggest customer, approximately once a month, and at times, as often as every day for three or four consecutive days. Sandell also testified that he never heard any criticism from anyone at Taylor-Listug to the effect that he "had no relationship with the chains [(i.e., chain stores)]" or that he was not "going out and meeting with the people from Guitar Center." When Listug asked Sandell to meet with Guitar Center, Sandell "went up there a couple different times." Further, according to Sandell, Listug asked Sandell on only a single occasion to meet with the "big independent dealers." Sandell testified that he did not do so because he "had relationships with big dealers" and "talked to them by telephone." In addition, Sandell explained that the "regional managers were very possessive of their accounts," and said that he never received any indication that the regional managers wanted him to meet "with their big accounts."

Taylor-Listug also contends that Listug specifically directed Sandell to have daily sales meetings with his team of employees, that Sandell failed to do so, and that this was part of the reason for his termination. Sandell maintains that he had daily contact with his employees, as well as weekly sales meetings.

The fact that the parties argue extensively about a number of factual issues, including the meaning of various sales numbers, whether Sandell did or did not respond to e-mails in a timely fashion, and whether the sales team did or did not complain about Sandell's leadership, demonstrates why this case is not an appropriate one for summary judgment and instead should be heard by a jury. The evidence is in conflict, and it is not up to the court to weigh conflicting evidence or to assess the credibility of witnesses. Rather, the court's duty is to determine only whether the evidence could, as a matter of law, support a judgment in favor of the nonmoving party. Here, the evidence is such that a reasonable fact finder could conclude that Taylor-Listug's proffered reasons for terminating Sandell's employment were unworthy of credence and, based on that conclusion, infer that those reasons are not the real reasons for Taylor-Listug's termination of Sandell. Sandell's prima facie showing, together with the evidence he presented regarding pretext, is sufficient to preclude a determination that, as a matter of law, Taylor-Listug is entitled to judgment in its favor at this point in the litigation.

### b. *Additional evidence of discriminatory motive*

In addition to the conflicting evidence as to whether Taylor-Listug's proffered reasons for terminating Sandell's employment were the actual reasons for the termination, Sandell also presented evidence of the existence of a discriminatory motive. With respect to Sandell's disability discrimination claim, Sandell recounted two statements that Listug made to him that troubled Sandell, and that appear to suggest the existence of some animus on Listug's part concerning Sandell's disability. One instance that Sandell described occurred in December 2004, after Sandell had returned to work full time. According to Sandell, Listug "came in my office . . . and closed the door and said that if I didn't make a full recovery, that the company had the right to fire me or demote me and reduce my salary." Sandell also testified that in the spring of 2005, "[Listug] called me to his office after one of our regular or routine sales meetings, and he asked me when I was going to get rid of the cane and when I was going to drop the dramatization."

Taylor-Listug does not address this evidence in its briefing on appeal. However, assuming for purposes of summary judgment that Listug did in fact make these comments, they would clearly constitute direct evidence of the existence of a discriminatory motive in Sandell's termination. In particular, the remark that Taylor-Listug could fire Sandell if he did not make a complete recovery from his stroke provides strong evidence that Listug—the person who made the decision to terminate Sandell's employment—was

motivated to do so by the fact that Sandell had not fully recovered from his stroke. The comment regarding when Sandell would "drop the dramatization" also creates a strong inference that Listug was annoyed with Sandell's use of a cane, and that he expected Sandell to conduct himself in a manner that would not evidence the existence of a disability. A reasonable fact finder could infer that the fact that Sandell continued to "act" disabled caused Listug to look unfavorably on Sandell, and ultimately led to Sandell's termination.

■ We reject the trial court's dismissive conclusion that these statements constitute mere "stray" remarks, such that they may be disregarded and considered to be of no legal consequence. Under the "stray" remarks doctrine, which has been employed by federal courts and, at times, adopted by some California courts at the summary judgment stage of discrimination cases, a "stray" discriminatory remark that a court determines is unconnected to the adverse employment action is insufficient evidence of a discriminatory motive, as a matter of law, and may be wholly disregarded by the court. (See *Gibbs v. Consolidated Services* (2003) 111 Cal.App.4th 794, 801 [4 Cal.Rptr.3d 187]; see also *Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1101 [38 Cal.Rptr.3d 240].) However, the Supreme Court recently clarified that California courts are not to apply the stray remarks doctrine because "its categorical exclusion of evidence might lead to unfair results." (*Reid, supra,* 50 Cal.4th at p. 517.)

Further, contrary to the trial court's conclusion that the remarks at issue in this case are, as a matter of law, unconnected to the adverse employment action, these comments could be seen as particularly significant evidence of the existence of a discriminatory motive. A comment, made by the person who ultimately decided to terminate Sandell's employment, to the effect that if he wanted to, he could terminate Sandell's employment if Sandell remained disabled, is as close to direct evidence of termination based on disability as one might find in a case of alleged discrimination. Further, in view of this remark, it is difficult to disregard the second comment, in which Listug allegedly suggested that Sandell should stop using his assistive device—i.e., that Sandell should stop "acting" or appearing to be disabled in the workplace. Coming on the heels of a direct threat of termination if he did not fully recover from his stroke, this second comment implies that Sandell was not recovering from his stroke to the degree that Listug thought he should be, and that Sandell was at risk of being fired if he continued to exhibit his disability. We conclude that both of the comments that Sandell attributes to Listug suggest that there may have been an improper motive for Sandell's firing. These remarks should be included in the mix of evidence to be presented to the trier of fact. Ultimately, it is the trier of fact that should determine the significance of these remarks.

C. *The trial court erred in summarily adjudicating Sandell's age discrimination claim*

As with Sandell's disability discrimination claim, the trial court concluded that Sandell failed to present a prima facie case of age discrimination. The court further concluded that even if Sandell had sufficiently made out a prima facie case of age discrimination, Taylor-Listug had produced evidence demonstrating that it fired Sandell for a nondiscriminatory reason, and Sandell failed to present evidence that the reason that Taylor-Listug offered was merely a pretext for discrimination. We conclude that there remain disputed material issues of fact with respect to Sandell's age discrimination claim that render summary adjudication of this claim inappropriate.

1. *Legal standards applicable to a FEHA age discrimination claim*

In order to make out a prima facie case of age discrimination under FEHA, a plaintiff must present evidence that the plaintiff (1) is over the age of 40; (2) suffered an adverse employment action; (3) was performing satisfactorily at the time of the adverse action; and (4) suffered the adverse action under circumstances that give rise to an inference of unlawful discrimination, i.e., evidence that the plaintiff was replaced by someone significantly younger than the plaintiff. (*Hersant, supra*, 57 Cal.App.4th at pp. 1002–1003.)[12]

2. *Sandell presented a prima facie case of age discrimination*[13]

a. *Satisfactorily Performing*

Taylor-Listug maintains that Sandell cannot demonstrate that he was performing his job satisfactorily. Taylor-Listug cites to *Wilkins v. Eaton Corp.* (6th Cir. 1986) 790 F.2d 515, 521, for the proposition that Sandell must show that he "was doing his job well enough to rule out the possibility that he was

---

[12] The *Hersant* court questioned whether a plaintiff must actually show that someone significantly younger than the plaintiff replaced him, for purposes of a prima facie showing, but concluded that it did not have to resolve that question under the facts presented in that case. (See *Hersant, supra*, 57 Cal.App.4th at p. 1003, fn. 3, citing, e.g., *O'Connor v. Consolidated Coin Caterers Corp.* (1996) 517 U.S. 308, 309–313 [134 L.Ed.2d 433, 116 S.Ct. 1307] [under the federal Age Discrimination in Employment Act of 1967 (ADEA; 29 U.S.C. § 621 et seq.), "the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case"].) Because we conclude that Sandell has presented sufficient evidence to meet this requirement, like the *Hersant* court, we need not address the question and may presume that such a showing is required to demonstrate circumstances that give rise to an inference of unlawful discrimination.

[13] It is undisputed that Sandell meets the first two prongs of the prima facie test—i.e., that he is older than 40, and that he suffered an adverse employment action.

fired for inadequate job performance." However, we question whether this authority accurately sets forth the standard that a plaintiff must meet at the prima facie stage on summary judgment. While we agree that a plaintiff must demonstrate some basic level of competence at his or her job in order to meet the requirements of a prima facie showing, the burden-shifting framework established in *McDonnell Douglas* compels the conclusion that any measurement of such competency should, to the extent possible, be based on objective, rather than subjective, criteria. (See *White v. Columbus Metropolitan Housing Authority* (6th Cir. 2005) 429 F.3d 232, 242, fn. 6, citing, e.g., *Vessels v. Atlanta Independent School System* (11th Cir. 2005) 408 F.3d 763, 769 [any consideration of the employer's subjective criteria is not relevant until the later stages of the *McDonnell Douglas* framework, because "[a] contrary rule, under which an employer's subjective evaluation could defeat the plaintiff's initial prima facie case, cannot be squared with the structure and purpose of the *McDonnell Douglas* framework.].) A plaintiff's burden in making a prima facie case of discrimination is not intended to be "onerous." (*Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 253 [67 L.Ed.2d 207, 101 S.Ct. 1089] ["The burden of establishing a prima facie case of disparate treatment is not onerous."].) Rather, the prima facie burden exists in order to weed out patently unmeritorious claims.

There is substantial evidence that Sandell was performing competently in his job in terms of objective factors, and that he possessed the necessary qualifications for his job at the time he was fired. It does not appear to be in dispute that Sandell was qualified for his job at the time he was hired, and there is no evidence that he became unqualified for the job during his tenure at Taylor-Listug. Further, despite a decreasing overall market for guitars, there is evidence that sales of Taylor-Listug's products during Sandell's tenure with the company fell less than the market average, and that sales even increased during some of this time. In addition, viewing the evidence in the light most favorable to Sandell, a fact finder could reasonably conclude that Sandell's performance reviews demonstrated that he completed his tasks and that he was generally performing satisfactorily. Sandell also instituted a number of new sales programs at Taylor-Listug, as he had been hired to do. Although there may have been areas in which the company wanted to see improvement in Sandell's performance, there were other areas in which he exceeded expectations. In all, Sandell presented evidence that he was still qualified for his job at the time that Taylor-Listug terminated his employment, and that he was performing satisfactorily on objective measurements.

### b. *Circumstances giving rise to an inference of unlawful discrimination*

According to Taylor-Listug, Sandell cannot show that he was replaced by a substantially younger person because Listug, who is only five years younger

than Sandell, took over Sandell's duties immediately after Sandell was terminated. Taylor-Listug also argues that although it "eventually asked the vice-president of marketing, who is in his mid-forties, to run the sales department," this change occurred too long after Sandell was fired to "reasonably suggest a discriminatory motive."

We disagree. As Taylor-Listug acknowledges, although Listug temporarily took over the duties of vice-president of sales, Taylor-Listug ultimately replaced Sandell with a person in his "mid-forties." This occurred approximately a year and a half after Sandell was fired. Although such a delay in a different context, i.e., one not involving a specialized employment position at the highest levels of management, might present an evidentiary problem in a discrimination case, the fact that Taylor-Listug took some time to replace its vice-president of sales is not, in and of itself, a reason not to consider evidence that Sandell's ultimate replacement was significantly younger than Sandell.[14]

Taylor-Listug also argues that Sandell's case for age discrimination is "further undermined because Listug both hired and fired Sandell within a short period of time." Taylor-Listug cites *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 809 [85 Cal.Rptr.2d 459], in support of this argument. Indeed, citing federal law, the *Horn* court stated, " '[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.' [Citations.]" (*Ibid.*) The court in *Horn* also concluded that "five years is a relatively short time and is not so long a time as to attenuate the [inference]" that " 'there was no discriminatory motive.' " (*Id.* at p. 809 & fn. 7.) We question the *Horn* court's conclusion that five years is a "short time" in the context of a hiring and firing by the same person, in part because the *Horn* court itself noted that in "many" of the cases applying this inference, the hirings and firings occurred within a span of two years or less. (*Ibid.*)

Assuming, however, that we agree with the *Horn* court's pronouncement that "five years is a relatively short time" when considering evidence that the same person was responsible for the plaintiff's hiring and firing, in the

---

[14] Listug was also younger than Sandell, albeit by only five years. Taylor-Listug cites this fact as evidence negating the possibility of a discriminatory motive based on age. However, even evidence that a member of a protected class was replaced by an older individual would not conclusively disprove age discrimination. (*Loeb v. Textron, Inc.* (1st Cir. 1979) 600 F.2d 1003.)

situation presented here, there was a significant change that occurred during the period of time at issue in this case that undermines the so-called "strong inference" of no discrimination based on the same person being responsible for the hiring and firing. Specifically, after Sandell was hired, he suffered a stroke that caused him to appear to be significantly older than he may have appeared at the time he was hired. Taylor-Listug may have viewed the mere fact that Sandell suffered a stroke as something that happens only to "older" individuals. Thus, the period of time between Sandell's hiring and firing, even if considered to be short, might not, as Taylor-Listug suggests, create a "strong inference" that no discriminatory motive existed.

Further, even if a "strong inference" of no discrimination exists, this would not be a reason to grant summary judgment in Taylor-Listug's favor. A strong inference is just that—an inference. The fact that a juror could reasonably draw a different inference is sufficient to preclude summary judgment. (See Code Civ. Proc., § 437c, subd. (c) ["In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence, *except summary judgment may not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence . . .* which raise a triable issue as to any material fact." (italics added)]; see also *Saylin v. California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 261 [224 Cal.Rptr. 493] [court has no power to weigh one inference against another in a summary proceeding].)

3. *Sandell presented sufficient evidence to support his claim for discrimination in response to Taylor-Listug's proffer of nondiscriminatory reasons for terminating his employment*

a. *Sandell offered evidence that Taylor-Listug's proffered reasons for terminating his employment were untrue and were a mere pretext for age discrimination*

The same evidence that Sandell offers to support his claim that Taylor-Listug's proffered reasons for terminating his employment were false, and were merely a pretext for disability discrimination, also supports his contention that the proffered reasons were merely a pretext for age discrimination. We discuss this evidence in part III.B.3.a., *ante.* The evidence is such that a reasonable fact finder could conclude that Taylor-Listug's proffered nondiscriminatory reasons for firing Sandell were a pretext for getting rid of him because of his age.

b. *Other evidence of discriminatory animus*

In addition to the evidence discussed above, Sandell presented other evidence of discriminatory animus that is relevant to his age discrimination claim.

Sandell testified, "There [were] . . . several incidents of Bob Taylor announcing in management meetings that he would rather fire old people and replace them with newer, younger people because it was cheaper." Sandell further explained that he heard Taylor say that "he would rather get rid of an older, tenured employee and hire a younger employee because they were less—less expensive." If Taylor did make these comments, which is a determination for a fact finder to make after hearing the evidence from both parties, these comments suggest that there may have been a discriminatory motive for Sandell's firing. Although Taylor may deny that he in fact made such statements, there remains a factual dispute about exactly what Taylor said. We must accept the most favorable interpretation of the evidence for purposes of the summary judgment motion. A reasonable inference from this indirect evidence is that Taylor was motivated to terminate employees because of their age, and that as one of the two major decision makers at Taylor-Listug, Taylor would have had some influence over the decision to terminate Sandell.

In addition, Fagan testified that he "noticed that there were people that—that had been [at Taylor-Listug] a long time had left, folks that were older" and that Taylor-Listug then "had a lot of younger people that came in and took their place[s]." Fagan stated that it "seem[ed] like a lot of older people that were over 50 seemed to be leaving the company," and that he was noticing that he himself was "being written up on charges . . . that weren't correct and [he] kind of felt like [he] was being pushed out." According to Fagan, although he had worked at Taylor-Listug for "many, many years" and had "never had anything in [his] file," "all of a sudden I was being called in and being called on the carpet for actions that I thought were—were either petty or kind of sprung on me at the last minute." Taylor-Listug terminated Fagan's employment approximately four or five months after Fagan brought to the attention of the director of human resources his concerns about older employees being pushed out.

Sandell testified that at several points in time over three years, Listug made comments to Sandell to the effect that Sandell was "old compared to [Listug]." According to Sandell, Listug "would say something like, 'Boy, you

are old' or, 'You are getting up there.' " Taylor-Listug argues that these comments "are not 'direct evidence of discrimination,' especially since [they] were uttered years before Sandell was terminated." (Italics omitted.)[15] Taylor-Listug recites a number of other cases in which a supervisor's comment about an employee's age or lack of "energy" was either deemed to be "weak circumstantial evidence" or was held not to support a finding of discrimination. (See *Nidds v. Schindler Elevator Corp.* (9th Cir. 1996) 113 F.3d 912, 918–919; *Nesbit v. Pepsico, Inc.* (9th Cir. 1993) 994 F.2d 703, 705; *Sneddon v. ABF Freight Systems* (S.D.Cal. 2007) 489 F.Supp.2d 1124, 1130; *Craig v. Southwest Airlines* (C.D.Cal., Jan. 23, 2007, No. ED CV 04-1086-GHK (SSx)) 2007 U.S.Dist. Lexis 86418, p. *16, fn. 5.) However, none of those cases involved comments made in a context similar to the context in which the comments in this case were made. For this reason, we conclude that under the circumstances presented here, it is proper to consider whether this evidence, together with the other evidence that Sandell presented, would permit a reasonable fact finder to determine that Sandell's age motivated Taylor-Listug to terminate his employment. We conclude that this evidence would be sufficient to uphold a finding in Sandell's favor.[16]

Sandell also points to two other events that occurred during his employment at Taylor-Listug as evidencing a discriminatory motive in his termination. One is a meeting that took place in 2006, at which Listug allegedly asked everyone at the meeting to state his or her age. The other is a telephone call that Sandell received from Listug just before Listug terminated Sandell's employment. According to Sandell, Listug asked Sandell if it was his 60th birthday and wished Sandell a happy birthday. We conclude that neither Listug's question to everyone at a meeting inquiring about each person's age, nor Listug's question about Sandell's birthday and subsequent birthday wishes, could reasonably support an inference that Listug was motivated to terminate Sandell's employment because of Sandell's age. However, there remains sufficient other evidence from which one could reasonably infer that Taylor-Listug had a desire to get rid of older employees in order to hire younger ones, and that Taylor-Listug fired Sandell because of his age.

---

[15] There is an inconsistency in the various arguments that Taylor-Listug makes concerning the timing of events in this case. On the one hand, as discussed in part III.C.3.b., *ante*, Taylor-Listug argues that the time between Listug's hiring and firing of Sandell was "short," thereby creating a strong inference of no discrimination on Listug's part. On the other hand, with respect to the comments that Sandell offers as evidence of discriminatory intent, Taylor-Listug argues that these comments should be given no weight because they were made "years" prior to Sandell's termination.

[16] We recognize that the evidence on which Sandell relies to support his claim for age discrimination appears to be weaker than the evidence that he offers in support of his claim for disability discrimination. However, in the context of a motion for summary judgment, it is not our job to weigh the evidence but, rather, to consider whether the proffered evidence would provide a sufficient basis for a finding in favor of the nonmoving party.

IV.

DISPOSITION

The judgment of the trial court is reversed. The case is remanded for further proceedings. Appellant is awarded costs on appeal.

McDonald, Acting P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied September 30, 2010, and respondent's petition for review by the Supreme Court was denied December 15, 2010, S187395.