Filed 7/21/22  Resh v. Del Mar Union School Dist. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ELANA RESH, | D078804 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2019-00050250-CU-WT-CTL) |
| DEL MAR UNION SCHOOL DISTRICT, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory Pollack, Judge.  Reversed and remanded with instructions.

Law Office of David P. Strauss, David P. Strauss; Williams Iagmin and Jon R. Williams for Plaintiff and Appellant.

Artiano Shinoff, Paul V. Carelli, IV, Gil Abed and Daniel R. Shinoff for Defendant and Respondent.

## INTRODUCTION

Elana Resh, a first-grade teacher who was employed under three successive one-year contracts, found herself without a contract for the next school year after she disclosed to the principal that she had become pregnant.

Resh sued the school district for pregnancy discrimination in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code,[1] § 12900 et seq.) and sought compensatory and punitive damages. The trial court concluded there were no triable issues of fact with respect to Resh's discrimination claims and granted summary judgment for the school district.

We reverse the judgment and remand for entry of a limited summary adjudication order. On our de novo review, we conclude Resh presented sufficient evidence to raise triable issues of material fact to preclude summary adjudication of her pregnancy discrimination claims. Resh does not challenge summary adjudication of her claims for retaliation and for punitive damages. So we leave the trial court's decision on those claims undisturbed.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Resh's Employment with the Del Mar Union School District*[2]

In August 2015, the Del Mar Union School District (District) hired Resh on a one-year contract to teach first grade at Sage Canyon School (Sage Canyon) for the 2015-2016 school year. Resh is certified to teach elementary school in California and also holds a master's degree in childhood education from New York University. She had over 10 years of experience as an elementary school teacher when the District hired her.

---

[1] All further undesignated statutory references are to the Government Code.

[2] "Following the usual standard of review from the granting of a summary judgment, we view all conflicting facts in favor of [plaintiff], the party who opposed the motion for summary judgment." (*Davis v. Nadrich* (2009) 174 Cal.App.4th 1, 3, fn. 1.)

Resh's position was "temporary teacher." Although temporary teachers received the same training and benefits as permanent teachers, temporary teachers were not guaranteed a position each school year. However, Jason Romero, the District's Assistant Superintendent for Human Resources, told Resh she could expect to be rehired each subsequent year unless she had done something unlawful, declining enrollment eliminated the need for temporary teachers, or her performance was deemed substandard.

Temporary teachers received formal and informal feedback from District administrators. The process for providing formal feedback was laid out in the collective bargaining agreement between the District and the teachers' union. Article 11 of the collective bargaining agreement established a process for periodic evaluations. Section 11.1 of the collective bargaining agreement stated the purpose of the evaluations was to "assist teachers in developing competency and in realizing their potential" and to assure personnel decisions, in which a teacher's "competence is relevant, [are] made in a just and equitable manner."

Each year, teachers would meet with their designated evaluator sometime before October 15 to discuss the teacher's "objectives and standards to be achieved during the evaluation period." Temporary teachers then underwent two formal evaluations per school year. Each formal evaluation consisted of a pre-observation meeting with the designated evaluator, an observation by that evaluator, and a post-observation conference. The evaluator would conduct classroom observations and evaluate the teacher's instructional abilities. The evaluation was documented in an "Interim Observation & Evaluation Report" (Evaluation Report), which was provided to the teacher at the post-observation conference. Toward the end of the year, after the formal evaluations, the designated evaluator would meet with

3

the temporary teacher for an end-of-year summary conference and provide the temporary teacher with a report called an "Evaluation Summary."

If any teacher received a negative evaluation, the collective bargaining agreement required the evaluator to prepare a "written assistance plan." Article 11.7.4 of the collective bargaining agreement provided: "In the case of [a] negative evaluation[ ], or if any problems are noted, the evaluator shall take positive action to develop a written assistance plan which will assist the unit member [i.e., the teacher] in correcting any cited deficiencies. The evaluator's role to assist the unit member shall include, but not be limited to," "[s]pecific recommendations for improvement," "[d]irect assistance to implement such recommendations," and "[p]rovision of additional resources, without cost to the unit member, to be utilized to assist with improvements (i.e. a peer coach)."

In February and March of each year, the District would create a master list of all temporary teachers. Romero would meet with school principals to get "their ranking and . . . recommendations" regarding which temporary teachers to bring back for the following school year. Because all temporary teachers were on a one-year contract, Romero explained that "everybody [was] released" each year. Then "at the beginning of . . . the end [sic] of the school year," Romero would review the master list, and the principals' rankings and recommendations, with the District's Superintendent and Assistant Superintendent to determine which temporary teachers they would call back. The Superintendent and Assistant Superintendent were "the final decision-makers" who determined which temporary teachers were offered new contracts.

4

A.    *Resh's First Year at Sage Canyon (2015-2016 School Year)*

At Sage Canyon, formal evaluations were performed by the principal and assistant principal; they would also visit classrooms throughout the school year and provide informal feedback during those visits.  Resh worked at Sage Canyon for three years under Principal William Cameron and Assistant Principal Alison Fieberg.  Cameron conducted Resh's formal evaluations for her first year at Sage Canyon.

In the first evaluation, Cameron observed Resh on January 12, 2016, as she gave her students a reading lesson.  In his Evaluation Report,[3] Cameron stated that Resh had been "especially effective" at achieving the objectives of the lesson, and that "[t]he success of [her] set was visible in the transfer of knowledge to [the [students'] independent work."  In the section to provide suggestions for improvements, Cameron wrote that while "[a] majority of [Resh's] students were effective at being able to identify the main idea of a [reading] passage," Resh's use of the word "strategy" during the lesson may have caused the students confusion.

On March 8, 2016, Cameron sent Resh a handwritten note that said, "It was great to see your students solving math word problems today," and that it was "clear you are putting your . . . training to practice.  Nice work[.]"

In his second formal evaluation, Cameron observed Resh on March 24, 2016, as she taught a math lesson to her students.  In his Evaluation Report, Cameron wrote Resh had been "especially effective at teaching to the

---

[3]    The Evaluation Report was a form report with blank areas filled out by the evaluator, and it contained four sections:  (1) observed activities; (2) effective aspects of lesson; (3) conference discussion and/or next step regarding instructional or professional standards; and (4) suggestions for improvements regarding instructional or professional standards.

objective," and that she had generated "relevant activities [that] helped to increase attention, student accountability, and speed of learning." (Capitalization omitted.)  As a suggestion for improvement, Cameron stated Resh gave a word problem using a story that needed additional context to make the correct answer clearer.

Resh's end-of-year conference with Cameron took place on April 29, 2016.  Cameron gave Resh a report in which he had written, next to a list of Resh's annual goals, "100% goals achieved."  Cameron also gave Resh his Evaluation Summary, in which he stated:  "Although this is [Resh's] first year at Sage she has shown great progress and accomplishments in her teaching."  Resh had "developed successful and collaborative relationships with her first grade team, her students, and their parents."  Her "area of growth for next year will be to work on the social/emotional side of the child and look to build more inter-personal relationships with her students."  The last section of the Evaluation Summary provided three possible ratings: "Meets or Exceeds District Requirements," "Requires Improvement," and "Unsatisfactory."  Cameron gave Resh the highest possible rating, "Meets or Exceeds District Requirements."

Cameron also told Resh he considered her to be a "fantastic" teacher, and the District intended to rehire her for the next school year.  On May 26, 2016, Resh received and signed a contract for the 2016-2017 school year.  She was also hired by the District to teach math and writing at summer school in 2016.

B.  *Resh's Second Year at Sage Canyon (2016-2017 School Year)*

Fieberg conducted Resh's formal evaluations for her second year at Sage Canyon.  Resh met with Fieberg in October 2016 to discuss Resh's

6

annual goals. Fieberg did not tell Resh she needed to correct any perceived performance issues.

On January 11, 2017, Fieberg observed Resh as she taught an English lesson. Fieberg wrote in her Evaluation Report that she found Resh to be "especially effective at formulating a clear learning objective" and that Resh's "clarity about what students were responsible for learning . . . allowed [her] students to be clear as well." Under suggestions for improvements, Fieberg stated that Resh had not checked all of the students' answers to a problem and suggested Resh should make sure to "[m]onitor[ ] each child's response."

On April 5, 2017, Fieberg observed Resh as she gave her students a math lesson. In her Evaluation Report, Fieberg stated, "there were many effective aspects of this math lesson," including that "[a]s a class, [Resh and the students] solved a problem together, [and] shared strategies," and that Resh had "monitored student progress" and was "able to support a few students who chose an incorrect operation." As a suggestion for improvement, Fieberg noted that students had used a white board in front of the class during the lesson and she thought some students had difficulty seeing their work.

In addition to these formal evaluations, Fieberg also sent Resh informal handwritten notes. In one note, Fieberg told Resh she had observed "all students in [Resh's] class have their ideas and solutions validated," and that this had helped reinforce to her students that "first graders are problem solvers." In another note, Fieberg told Resh, "Your classroom is full of evidence of student learning. Sage Canyon is lucky to have you!" In another note, Fieberg told Resh she "was struck by how much [Resh's class]room has come to life since the beginning of the [school] year."

7

Resh's end-of-year conference with Fieberg took place on May 11, 2017. During the conference, Fieberg gave Resh an Evaluation Summary in which she stated Resh had "greatly improved" her skills as an instructor and described Resh as a "a highly motivated, reflective educator." Fieberg stated, "The district has benefited from her dedication[.]" Fieberg, like Cameron, gave Resh the highest possible rating, "Meets or Exceeds District Requirements."

In April 2017, Cameron told Resh not to look for employment outside the District, because the District intended to rehire her. On May 24, Resh received and signed a contract for the 2017-2018 school year. In May, the District invited Resh to participate in a District focus group whose purpose was to help the District develop objectives for the next five years. Resh was once again hired by the District to teach math and writing at summer school in 2017.

C.    *Resh's Third Year at Sage Canyon (2017-2018 School Year)*

Cameron conducted Resh's formal evaluations for her third year at Sage Canyon. Cameron met with Resh in October 2017 to discuss her annual goals. He did not tell her that she needed to address any perceived performance issues.

In the fall of 2017, Cameron selected Resh to attend an advanced District-wide training on innovative practices on behalf of Sage Canyon. During the 2017-2018 school year, Resh was also invited to join the District-wide "Writing Rubric Committee" as the District's only first-grade representative.

Cameron's first observation of Resh took place on January 23, 2018. In his Evaluation Report, Cameron wrote Resh had been "successful at engaging [her] students in the lesson through active participation." (Capitalization

8

omitted.) Under suggestions for improvements, Cameron "applaud[ed] [Resh's] willingness to provide [her] students more choice and agency in their learning," but stated her students "may have benefitted from additio[n]al modeling of what is needed[.]" (Capitalization omitted.)

In January 2018, Resh told Cameron she was going to undergo *in vitro* fertilization over the course of four days in February. Cameron approved her request to take a leave of absence for that purpose.

On March 28, 2018, Romero held a meeting with the temporary teachers. Romero told the temporary teachers, including Resh, that if they were going to be "let go for performance reasons," they would already have been notified of this by their principals, and the remaining temporary teachers would not be rehired only if decreased enrollment "rendered [them] surplusage." At the time of this meeting, Resh had not been notified by Cameron that her performance was anything but satisfactory.

On April 2, 2018, Cameron conducted his second formal observation of Resh. In his Evaluation Report, Cameron stated Resh had been successful at "help[ing] [her] students remain engaged in the lesson while also setting them up for success when working independently to solve the [math] problem." As a suggestion for improvement, Cameron offered that when Resh asked students to share strategies with peers, "some students had challenges finding a peer and effectively communicating their strategy," resulting in "some off-task behavior and conversations not related to math." He stated that modeling for peer share sessions "may help students be more successful in the future."

Also on April 2, 2018, Resh told Cameron she was pregnant and that she was due in October. Cameron congratulated Resh and gave her a hug. Resh anticipated taking pregnancy disability leave and/or family leave under

the California Family Rights Act in the fall of 2018 in connection with the birth of twins.

About one month later, on May 3, 2018, Cameron met with Resh for her end-of-year conference. Cameron provided Resh an Evaluation Summary in which he stated Resh had "stretch[ed] [her] thinking [and] teaching this year," and she had learned new teaching techniques at "the trainings she attended this year" and had "implemented them into her classroom with success." He did not state that Resh's performance was lacking or that she had failed to achieve her annual objectives and standards. He again gave Resh the highest possible rating of "Meets or Exceeds District Requirements."

But in this meeting, Cameron told Resh she would not be rehired for the 2018-2019 school year. When Resh asked why, Cameron told her she was "not moving in the same direction as the school" and was "not a good fit."

Resh asked Cameron and Fieberg for letters of recommendation. Cameron gave Resh a letter in which he lauded Resh's teaching abilities, including her "competence as a teacher, work ethic, organization, [and] ability to work with others." He stated that Resh's "ability to support students' academic, social and behavioral development . . . [was] impressive," and that Resh had achieved a "notable impact with her students and families." Fieberg gave Resh a letter of recommendation in which she made a number of detailed, positive observations of Resh's accomplishments and contributions as a first-grade teacher at Sage Canyon.

Although Resh was not rehired as a temporary teacher at Sage Canyon, the District hired her to teach summer school for a third time in July 2018.

## II.

### *The Lawsuit*

A.  *Resh's Complaint*

Resh sued the District for pregnancy discrimination.  She alleged the District did not rehire her because of her pregnancy.  She asserted six causes of action against the District:  (1) denial of pregnancy disability leave, in violation of section 12945, subdivision (a)(1); (2) interfering with Resh's right to take pregnancy-related leave under section 12945, subdivisions (a)(1) and (4); (3) discrimination based on sex and/or pregnancy, in violation of section 12940 et seq.; (4) retaliation for exercising rights protected by FEHA, in violation of section 12940, subdivision (h); (5) pregnancy discrimination by a school district in violation of section 12943; and (6) failure to take all reasonable steps to prevent discrimination, in violation of section 12940, subdivision (k).  Resh sought compensatory and punitive damages, in addition to other monetary relief.

B.  *The District's Motion for Summary Judgment, or Alternatively, Summary Adjudication*

In January 2021, the District moved for summary judgment, or alternatively, summary adjudication of all causes of action in the complaint. The District assumed for purposes of its motion that Resh could "put forth a prima facie case" of pregnancy discrimination, but asserted its evidence established that the District's decision not to rehire Resh was based on legitimate, nondiscriminatory reasons.  It also sought summary adjudication

11

of Resh's request for punitive damages on the ground that school districts are not liable for punitive damages pursuant to section 818.[4]

First, the District argued "the undisputed facts show that the decision not to renew [Resh's contract] was made *before* anyone at the District knew, and before Resh informed any District administrator that she was pregnant." Relying on deposition testimony of Cameron, Romero, and Fieberg, the District asserted Cameron had decided to recommend against rehiring Resh no later than "[o]n or about March 9, 2018," when Romero assertedly had his one-on-one staffing meeting with Cameron to consider teacher rankings. It asserted that Resh told Cameron she was pregnant on April 2, 2018, based on Resh's deposition testimony in which she appeared to agree that, as alleged in her complaint, she had disclosed her pregnancy to Cameron on that date. Thus, the District argued its employment decision "was not based on her pregnancy."

Second, the District argued it "seeks to hire—and retain—'rock stars'" and that Resh did not fit this description. It claimed Resh had "ranked towards the bottom" of Sage Canyon's temporary teachers for "three straight years," and that it decided not to rehire Resh because she "simply did not perform her job duties . . . as well as her peers." It submitted excerpted deposition testimony of Cameron, Fieberg, and Romero to support these contentions.

Fieberg testified she found Resh to be "a little bit cold at times," and that "[s]ometimes some of [Resh's] communication with . . . students . . . could

_____

4    Section 818 provides that "a public entity is not liable for [punitive] damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant."

be qualified as short or appearing to be frustrated." Fieberg testified she and Cameron felt that Resh struggled to form relationships with her students or with "the parent community." Fieberg claimed that on one occasion, Resh commented to Fieberg that her students were reading quietly, and she hoped they would do so as long as possible. Resh's comment led Fieberg to believe Resh "would prefer to not be interacting with [the students]." Fieberg recalled she and Cameron had been in agreement that Resh was "at the bottom of the list" when it came to ranking temporary employees. She testified her overall impression of Resh was that she was "a good teacher" but not "the best," and "[they] have an obligation to employ the best."

Cameron testified he had told Resh informally that he felt her classroom was overly structured. Although he had decided to bring her back for a third year, Cameron testified it had been a late decision. He also testified that during an observation of Resh's classroom in her third year, she read off a script during the lesson, which he found unprofessional. Cameron ultimately decided Resh "wasn't a fit," because he had expected Resh's training would have "gelled by year three" but "didn't see [the training] really coming into play," and because he didn't see "excitement and kids wanting to be in that classroom[.]"

Romero testified Cameron had recommended that Resh should not be brought back for a fourth year because she "was not the right personality" and was "not a rock star."

The District also submitted documentary evidence, which included Resh's Evaluation Reports, and two other documents. The first document was titled "Staffing Meeting Notes." (Capitalization omitted.) It was dated April 4, 2017 and was mostly redacted. In the unredacted portion, the following text was typewritten next to Resh's name: "Personality wise not

13

the best, but maybe grade level. See her more as 2nd - 4th grade teacher. Not super bubbly, but not to say great teacher [sic]." The second document had "SAGE CANYON" typewritten at the top. A list of 45 names, including Resh's, ran from top to bottom on the left side of the page. At the bottom right-hand corner of the page, it stated in typewritten text, "As Of: [¶] 3/9/2018." The rest of the document was filled with handwritten notes. One handwritten note near Resh's name read: "5 - Dont bring Back - observations [¶] not good [sic]."

The District argued that even "[a]ssuming Resh has put forth a prima facie case" of pregnancy discrimination, its evidence established the decision not to rehire Resh was based on legitimate, nondiscriminatory reasons unrelated to her pregnancy. It also argued Resh would not be able to prove these assertedly legitimate reasons for its employment decision were pretextual. The District asserted it was undisputed Resh had not told Cameron she was pregnant until April 2, 2018. It claimed its evidence showed the decision not to rehire Resh was made "on March 9, 2018," before Resh disclosed she was pregnant, and that this "timeline of events categorically disproves any allegation of pretext."

C.    *Resh's Opposition to Summary Judgment*

In opposition, Resh submitted evidence that included her own declaration as well as numerous documents and deposition excerpts. In her declaration, Resh averred that under the collective bargaining agreement, any problems observed during her formal evaluations required the District to prepare a written assistance plan to assist her in correcting any perceived deficiencies. She attached copies of all of her formal evaluation reports, and averred Cameron and Fieberg had not identified any problems with her performance and had never prepared a written assistance plan for her.

14

Instead, they had consistently given her the highest possible rating of "Meets or Exceeds District Requirements."

Resh also provided copies of the handwritten notes she received from Cameron and Fieberg complimenting her performance at Sage Canyon, as well as letters of recommendation Cameron and Fieberg wrote after she was told her contract was not being renewed. She averred Cameron and Fieberg had never informed her that her performance was substandard, and specifically denied Cameron told her that her classroom seemed overly structured. She averred Fieberg or Cameron had also never informed her they believed she had trouble developing relationships with her students or the parent community. She submitted copies of communications and thank-you notes from students and parents, and asserted these showed that she had, in fact, developed positive relationships with students and parents.

Resh averred she told Cameron she had become pregnant "[a]t or about the time of [her] April 2, 2018 Observation." She further averred Cameron "had been aware of [her] *in vitro* fertilization which took place . . . in early February 2018" because Cameron had approved her leave of absence "for that purpose." It was not until her May 3, 2018 end-of-year conference with Cameron that he told her she was not going to be rehired. When she asked why, he told her she was "not moving in the same direction as the school or the District and that [she] was not a good fit."

Resh asserted Cameron and Fieberg's claims that her performance had been subpar had not been communicated to her during her employment, and that they were refuted by their positive formal evaluations, informal handwritten notes, and letters of recommendation. She "denie[d] any informal criticism by either of them." She argued the legitimacy of the

District's employment decision was therefore "replete with triable issues of fact."

Resh specifically disputed that Romero's staffing meeting with Cameron to consider temporary teacher rankings had taken place "[o]n or about March 9, 2018." She asserted Romero does not remember the date he held that staffing meeting and, although the document titled "SAGE CANYON" was dated March 9, 2018, Romero testified he does not know the date of the actual meeting with Cameron. Resh argued, however, that even if the District made its rehiring decision before she disclosed her pregnancy on April 2, she still had a viable pregnancy discrimination claim because Cameron knew before March 9 that she had undergone *in vitro* fertilization.

Although Resh opposed summary judgment, she stipulated to summary adjudication of her fourth cause of action for retaliation. She also did not specifically refute the District's contention that her claim for punitive damages was barred by section 818.

D.   *The District's Reply*

In reply, the District submitted an excerpt of Resh's deposition testimony in which she stated she told Cameron she was pregnant on April 4, 2018. The District asserted in a footnote of its reply brief that Resh had "changed the date" in the course of her deposition testimony. The District emphasized its decision not to rehire Resh had been made on or around March 9, 2018, well before Resh disclosed her pregnancy, and argued there was no possibility of a "causal link" between its decision and Resh's pregnancy.

E.   *The Trial Court's Ruling*

Following an unreported hearing, the trial court granted the District's motion for summary judgment. The court noted Resh conceded to summary

16

adjudication of her fourth cause of action for retaliation and had offered no opposition to summary adjudication of her claim for punitive damages.

Turning to Resh's remaining five causes of action, the trial court observed each was dependent on the assertion that the District's decision not to renew Resh's contract for a fourth year was based on her pregnancy. The court found "fatal to these claims is the uncontroverted facts that (1) the decision not to renew Resh's contract for a fourth year was made at a staffing meeting on or about March 9, 2018 . . . and (2) Resh did not advise [the District] of her pregnancy until April 2 (or 4), 2018." The court concluded that "[s]ince the decision to not renew Resh's contract . . . was made at a time when [the District] was unaware of her pregnancy, it cannot be said that she was discriminated against on account of her pregnancy."

The trial court further ruled Resh could not rely on evidence of her *in vitro* fertilization procedure to substantiate her discrimination claims, because her complaint was "totally devoid of any allegations of an '*in vitro* fertilization attempt' discrimination or attempt to become pregnant discrimination claim." The court observed that Resh had not attempted to amend her complaint to assert such a theory of liability, and stated it was "left to base its ruling on the original allegations."

The court granted the District's motion for summary judgment and entered judgment in favor of the District in February 2021. Resh timely appealed.

## DISCUSSION

On appeal, Resh challenges the trial court's entry of summary judgment on three grounds. First, she contends there were triable issues of fact as to whether the decision not to rehire her was made before she disclosed her pregnancy, precluding the court from determining as a matter

17

of law that the District's employment decision could not have been an act of pregnancy discrimination. Second, she contends the summary judgment evidence, and the inferences reasonably supported by that evidence, supported the conclusion that the District's proffered reasons for its decision not to rehire her were pretextual. Third, she contends the court erred in declining to consider her theory of pregnancy discrimination based on her *in vitro* fertilization procedure, because this theory was reasonably encompassed by the allegations of her complaint.

Although Resh asks us to reverse the judgment in its entirety, her arguments on appeal are limited to establishing the trial court erred in summarily adjudicating her pregnancy discrimination claims. She does not argue the trial court erred in summarily adjudicating her fourth cause of action for retaliation based on her stipulation it could be summarily adjudicated, nor does she contend the trial court erred in granting the District's unopposed motion for summary adjudication of her punitive damages claim. Because Resh has not challenged these aspects of the trial court's decision, we presume they are correct and will leave them undisturbed. (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 544, fn. 8 [because "[a]n appealed-from . . . order is presumed correct," "the appellant must make a challenge"].)

We therefore construe Resh's appeal as challenging the trial court's decision to grant summary adjudication in favor of the District as to her remaining five causes of action alleging pregnancy discrimination. The merits of these causes of action are determined according to the burden-shifting analysis discussed in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317 (*Guz*). (See *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 746, 755 [applying this burden-

18

shifting test to claims of pregnancy discrimination under section 12940, subdivisions (a)(1) and (k), and denial of pregnancy disability leave under section 12945].)

I.

*Governing Legal Principles*

California courts use the three-stage burden-shifting test established in *McDonnell Douglas Corp v. Green* (1973) 411 U.S. 792 for trying claims of discrimination. (*Guz*, *supra*, 24 Cal.4th at pp. 354–356.) The "*McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Id.* at p. 354.)

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled." (*Guz*, *supra*, 24 Cal.4th at p. 354.) To meet this burden, the plaintiff generally must present evidence that (1) she was a member of a protected class, (2) she was qualified for the position she sought or was performing competently in the position she held, (3) she suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. (*Id.* at p. 355.)

"If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises." (*Guz*, *supra*, 24 Cal.4th at p. 355.) Then, "at this trial stage, the burden shifts to the employer to rebut the presumption by

19

producing admissible evidence, sufficient to 'raise[ ] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason." (*Id.* at pp. 355–356.)

"If the employer sustains this burden, the presumption of discrimination disappears." (*Guz, supra*, 24 Cal.4th at p. 356.) "The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive. [Citations.] In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias." (*Ibid.*)

A defendant employer's motion for summary judgment slightly modifies the order of the showings required by the *McDonnell Douglas* test. (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 309 (*Sandell*); *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 343–344 (*Arteaga*).) " ' " 'If the employer presents admissible evidence either that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment *unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.* In short, by applying *McDonnell Douglas's* shifting burdens of production in the context of a motion for summary judgment, "the judge . . . determine[s] whether the litigants have created an issue of fact to be decided by the jury." ' " ' " (*Sandell,* at p. 309, quoting *Arteaga,* at pp. 343–344.)

When a party appeals the entry of summary judgment, the reviewing court makes " ' "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or

20

whether the moving party is entitled to judgment as a matter of law." ' " (*Hesperia Citizens for Responsible Development v. City of Hesperia* (2007) 151 Cal.App.4th 653, 658.) "[W]e must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing [the] defendant's own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*).) " ' In the summary judgment context . . . the evidence must be *incapable* of supporting a judgment for the losing party in order to validate the summary judgment.' " (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 877 (*Faust*), italics added.) " 'Thus even though it may appear that a trial court took a "reasonable" view of the evidence, a summary judgment cannot properly be affirmed unless a contrary view would be unreasonable as a matter of law in the circumstances presented.' " (*Ibid.*)

" '[F]rom commencement to conclusion, the party moving for summary [adjudication] bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law.' " (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 32 (*Zamora*).) As we turn to the merits, we note "many employment cases present issues of intent and motive, issues not determinable on paper. Such cases '*are rarely appropriate for disposition on summary judgment*, however liberalized [summary judgment standards may] be.' " (*Id.* at p. 33.)

21

## II.

*Triable Issues of Material Fact Preclude Summary Adjudication*

*of Resh's Pregnancy Discrimination Claims*

A.  *Evidence of the Date of Cameron's Rehiring Decision Was Conflicting, and Raised a Triable Issue of Whether He Made His Decision Before or After Resh Disclosed Her Pregnancy*

The trial court summarily adjudicated Resh's pregnancy discrimination claims because it found two facts to be "uncontroverted": (1) the District's decision not to rehire Resh was made at a staffing meeting "on or about March 9, 2018" and (2) Resh did not advise the District of her pregnancy until April 2 or 4, 2018. Consequently, the trial court concluded the District was unaware of Resh's pregnancy when it made its rehiring decision and so, as a matter of law, "it cannot be said that [Resh] was discriminated against on account of her pregnancy." Resh argues the trial court erred, and that critical factual disputes surrounded the date of Cameron's rehiring decision and substantial evidence supported the conclusion the adverse employment decision was made after Resh disclosed her pregnancy. On our de novo review, we agree with Resh.

We first consider the evidence of the date Resh disclosed her pregnancy. The parties agree the relevant disclosure was to Cameron. As the school principal, Cameron was responsible for ranking Sage Canyon's temporary teachers "based on how [he] would prefer to have them come back," and would meet with Romero to provide his recommendations and discuss which temporary teachers to retain.

Resh's testimony about the date she disclosed her pregnancy to Cameron was inconsistent, although the disparity only involves a difference of two days. In her deposition and opposing declaration, she alternately gave April 2, 2018 and April 4, 2018 as the date she told Cameron she was

pregnant. The District appears to favor using April 4 as the date of Resh's disclosure. But Resh contends that for purposes of our review, we must consider April 2 to be the pertinent date. Resh is correct. The governing standard of review requires us to view the evidence in the light most favorable to the plaintiff (*Saelzler, supra*, 25 Cal.4th at p. 768), and in this factual setting, the earlier of the two dates is more favorable to Resh's position because it increases the opportunity for overlap with the rehiring decision. We also observe the District conceded in its separate statement of undisputed facts that "Resh told Cameron she was pregnant on or about April 2, 2018." In determining if the evidence raises a triable issue of whether Resh made her disclosure before or after the rehiring decision, we consider the disclosure to have occurred on April 2.

We next consider the evidence on the date the District made its decision not to rehire Resh. The parties agree the relevant decision was made by Cameron. Although the final decisionmakers were the District's Superintendent and Assistant Superintendent, it was Cameron who recommended the District not offer Resh a contract to teach the 2018-2019 school year and, as Romero had testified, Cameron's recommendation influenced the District's final decision to not renew Resh's contract to teach a fourth year at Sage Canyon. Resh argues the evidence of the date Cameron made his decision was conflicting, and there was substantial evidence Cameron decided against rehiring Resh not only well after March 9, 2018, but more importantly, after he learned about her pregnancy on April 2. We agree.

First, Resh points to her declaration, in which she averred that at the March 28, 2018 meeting with the temporary teachers, Romero stated that if any temporary teachers "were going to be let go for performance reasons,"

they would already have been notified of this by their principals. The evidence was undisputed that Cameron did not inform Resh of the District's decision to not rehire her until May 3, at her end-of-year conference. One can reasonably infer from these facts that at least as of March 28, Cameron had not yet decided to recommend against rehiring Resh.

Second, Resh points to Cameron's deposition testimony about the date he decided to recommend against rehiring her. Cameron initially testified: "It was a difficult decision to make, but the decision to let Ms. Resh go, in my mind, was done well before I knew she was pregnant." But when counsel asked when he made his decision, Cameron equivocated. He testified:

"A. I wouldn't know the specifics, but I would say in late January, early February. For sure when Mr. Romero had come to do the rankings, we knew at that time. So it was, I think, it's my recollection, before I even knew that she was pregnant.

"Q. So this was before or after the first observation in that calendar year, that school year?

"A. I don't recall. It would have been after -- I imagine after the first one.

"Q. But before the second one?

"A. Possibly. I don't recall. *But for sure after the second observation my mind was made up.*" (Italics added.)

It is undisputed that Cameron's second observation of Resh took place on April 2, 2018. Thus, Cameron's testimony that his mind was made up "for sure after the second observation" supports the conclusion he made his decision to not rehire Resh after April 2, the same date he learned about her pregnancy.

In response, the District emphasizes that Cameron initially testified he made his decision before he knew Resh was pregnant, and his opening estimate of the date of his decision was "late January, early February." Cameron's subsequent testimony, however, conflicted with these earlier

assertions. His initial testimony was also couched in equivocal language ("I would say," "I think," "I don't recall," and "I imagine"), whereas he was more emphatic (his precise words were "for sure") in stating that his "mind was made up" "after the second observation." Under the governing standard of review, we must view the evidence in the light most favorable to the plaintiff (*Saelzler*, *supra*, 25 Cal.4th at p. 768) and affirm only if the evidence is " 'incapable of supporting a judgment for the losing party' " (*Faust*, *supra*, 150 Cal.App.4th at p. 877). Here, although Cameron's testimony was conflicting, when viewed in the light most favorable to Resh, it is not incapable of supporting a judgment in her favor.

The District tries to prevent us from arriving at this conclusion by citing evidence that, in its view, demonstrates Cameron made his decision on or around March 9, 2018. First, it points to the document titled "SAGE CANYON," which had a list of names (including Resh's) and "As Of: [¶] 3/9/2018" typewritten on it, and which was otherwise filled with handwritten notes. The District contends this document is the "notes on the meeting that Cameron had with Romero regarding teacher rankings."[5] It asserts this

_____

[5] The document itself does not independently establish it is the notes from the meeting between Cameron and Romero, nor does the District direct us to any testimony authenticating this document or confirming it is what the District suggests it to be. In the trial court, Resh objected that the document was not properly authenticated, but the trial court overruled this objection. On appeal, Resh does not challenge this evidentiary ruling and so has failed to tender the propriety of the court's ruling for our consideration (see *White v. Smule, Inc.* (2022) 75 Cal.App.5th 346, 353, fn. 2 ["the burden is on [the party] to renew any relevant objection by arguing the issue in its brief"]). Even accepting the document relied on by the District constitutes the notes of this meeting, we still conclude there is a triable issue of fact whether Cameron made his decision to not rehire Resh before or after learning of her pregnancy.

document "indicates a date of March 9, 2018," but it does not contend the document proves the meeting between Cameron and Romero actually occurred on March 9. Next, the District quotes the following testimony from Romero's deposition:

"Q. And the document itself says 3/9/2018. Is that when your one-on-one was, or at some point in time you brought this document with you and sat down with Mr. Cameron?

"A. Yeah, probably that week. I don't remember exactly."[6]

The District appears to contend this evidence demonstrates that Romero and Cameron met within a week of March 9 to discuss Cameron's recommendations, and that Cameron therefore must have made his decision to recommend against offering Resh another contract by mid-March.

Even if we accept the District's interpretation of this evidence, at most, it merely serves to demonstrate there is a factual dispute about the timing of Cameron's decision. To the extent the notes and Romero's testimony support the conclusion Cameron made his decision by mid-March 2018, there was evidence pointing to a later date, including: (1) Resh's declaration that Romero said during the March 28 meeting with the temporary teachers that any temporary teachers who "were going to be let go for performance reasons" would already have been told so by their principals, and (2) Cameron's testimony that he made his decision after Resh's second observation, which took place on April 2. Cameron's testimony on the latter fact creates a material dispute precluding summary adjudication, because it supports the

---

[6] The relevant page containing this quoted testimony from Romero's deposition transcript was not included in the District's summary judgment evidence. Resh did not object to the omission, and the District included the quoted testimony in its reply brief filed in the trial court. On appeal, both sides quote this testimony, and Resh does not object to our consideration of it.

reasonable inference that Cameron was, in fact, aware of Resh's pregnancy when he decided to recommend against rehiring her.

The District, in relying on evidence that suggests a different date than the evidence relied on by Resh, fails to establish " 'there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law.' " (*Zamora*, *supra*, 71 Cal.App.5th at p. 32.)  Instead, because the evidence regarding the date of Cameron's decision creates a dispute as to a fact material to Resh's claims of pregnancy discrimination, the issue must be resolved by a jury.  (See *Guz*, *supra*, 24 Cal.4th at p. 334 [summary judgment should not be granted unless the defendant "demonstrate[s] that under no hypothesis is there a material issue of fact that requires the process of trial"].)

In sum, there is substantial evidence in the record supporting the conclusion that Resh told Cameron she was pregnant on April 2, 2018.  The record likewise contains substantial evidence from which a jury could reasonably conclude Cameron made his decision to recommend against renewing her contract after April 2, at a time when he was aware of her pregnancy.  The trial court erred in granting summary adjudication of Resh's discrimination claims on the ground that it was undisputed the rehiring decision preceded, and was necessarily unaffected by, the news of Resh's pregnancy.

B.  *In Response to the District's Proffer of Legitimate, Nondiscriminatory Reasons for Its Employment Decision, Resh Presented Sufficient Evidence to Raise a Triable Issue of Whether These Reasons Were False or Pretextual*

In moving for summary adjudication, the District argued its evidence established the decision to not rehire Resh was made for legitimate, nondiscriminatory reasons, in addition to its argument that the decision was made before she disclosed her pregnancy.  The District contends even if we

27

determine the trial court erred in concluding, as a matter of law, that the adverse employment decision was made before Resh disclosed her pregnancy, we should affirm on the ground that Resh failed to present sufficient evidence that the assertedly legitimate reasons for its employment decision were false or pretextual. We disagree that Resh's evidence was insufficient to raise a triable issue of whether the District's proffered reasons were false or pretextual.

"Once the employer has offered a legitimate, nondiscriminatory reason for the adverse employment action, a ' "plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated." ' " (*Sandell*, *supra*, 188 Cal.App.4th at p. 314.) "In demonstrating that an employer's proffered nondiscriminatory reason is false or pretextual, ' "[an employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for the [asserted] non-discriminatory reasons.' " ' " (*Ibid.*; see *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68 [" '[T]he plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by

28

showing that the employer's proffered explanation is unworthy of credence." ' "].)

Resh contends her evidence was sufficient to raise a triable issue of whether the District's asserted reasons to not rehire her were false or pretextual, precluding summary adjudication of her discrimination claims. She argues her case is like *Sandell*, in which this court determined there was conflicting evidence from which a trier of fact could have found the employer's proffered reasons for terminating the plaintiff's employment were untrue, and thus infer that the proffered reasons were a pretext for discrimination. (See *Sandell*, *supra*, 188 Cal.App.4th at pp. 314–319.) We agree this case is analogous to *Sandell*.

*Sandell* involved a claim of disability and age discrimination by a 60-year old plaintiff who was terminated after he suffered a stroke and experienced residual effects in his ability to walk and speak, and was replaced by a person in his " 'mid-forties.' " (*Sandell*, *supra*, 188 Cal.App.4th at pp. 303–306, 323.) The plaintiff, Sandell, was hired as senior vice-president of sales for a guitar manufacturer. In a motion for summary judgment, the employer claimed it had terminated Sandell based on legitimate concerns about his performance as the leader of his sales team and in producing satisfactory sales results. (*Id.* at p. 315.) The employer relied, in part, on Sandell's performance evaluations, and "broadly assert[ed] that 'all of [his] performance evaluations document[ed] multiple problems and concerns.' " (*Ibid.*) It also presented declarations from members of the sales team complaining about Sandell's "lack of leadership" and "failure to maintain e-mail communication." (*Id.* at p. 316.)

In reversing the trial court's grant of the employer's summary judgment motion, we concluded Sandell had presented sufficient evidence to

place in dispute the validity of the employer's proffered reasons for his termination, in part, because our de novo review of the record did not compel *only* the employer's interpretation of Sandell's performance evaluations. (*Sandell*, *supra*, 188 Cal.App.4th at p. 315.)

Over the course of his employment, Sandell received three annual performance reviews. (*Sandell, supra*, 188 Cal.App.4th at p. 305.) In the first, Sandell's performance was "meeting or exceeding requirements" in all areas in which he was reviewed, except for one. (*Ibid.*) He was told he " '[m]ust improve' " under " '[r]esults' " but his employer made comments that he was not entirely to blame for poor sales that review period. (*Ibid.*) In the second review, Sandell's performance was "meeting requirements across the board" and "exceeding requirements in some areas." (*Ibid.*) The review also contained "some subjective concerns" that his employer would like Sandell to show " 'more enthusiasm' " and be " 'more outgoing and friendly.' " (*Ibid.*) In the final review, Sandell's performance was "meeting requirements in three areas" and "needing improvement" in three others. (*Id.* at p. 306.) There was also positive feedback, including that Sandell had " 'contributed positively to the company,' " had " 'provided stability to the sales area that was lacking,' " the staff liked and respected him, and he was " 'generally on top of what [wa]s happening in sales.' " (*Ibid.*) On this record, we concluded a trier of fact could reasonably find Sandell's performance reviews were "overall, quite positive." (*Id.* at pp. 315–316.)

We further noted that while the employer presented evidence that "a number of [its] employees *currently* claim that they had complaints about Sandell's leadership, the evidence further demonstrated that none of these employees ever brought these complaints to the attention of [management] while Sandell was working for the company." (*Sandell, supra*, 188

30

Cal.App.4th at p. 317.) Thus, "[a] reasonable person could . . . infer that at the time the decision to terminate Sandell was made, [the employer's] decision makers did not have the kind of feedback about Sandell's performance that they now suggest was the impetus for terminating his employment." (*Ibid.*) Additionally, Sandell presented testimony from a sales manager who had worked under him "concerning all of the positive things" that Sandell accomplished as vice-president of sales, and that he never had any complaints about Sandell's performance that he discussed " 'with anyone' " at the company. (*Id.* at pp. 317–318.)

We concluded in *Sandell* that "th[e] case is not an appropriate one for summary judgment and instead should be heard by a jury. *The evidence is in conflict*, and it is not up to the court to weigh conflicting evidence or to assess the credibility of witnesses. Rather, the court's duty is to determine only whether the evidence could, as a matter of law, support a judgment in favor of the nonmoving party." (*Sandell, supra,* 188 Cal.App.4th at p. 319, italics added.) We found "the evidence is such that a reasonable fact finder could conclude that [the employer's] proffered reasons for terminating [the plaintiff's] employment were unworthy of credence and, based on that conclusion, infer that those reasons are not the real reasons for [the employer's] termination of [plaintiff]." (*Ibid.*) We concluded the plaintiff's showing was sufficient to raise triable issues of material fact to preclude a determination that, as a matter of law, the employer was entitled to judgment in its favor. (*Ibid.*)

Here, like *Sandell*, the District claims it did not rehire Resh because of her assertedly inadequate performance. Like the employer in *Sandell*, it asserts "Resh's evaluations are *replete* with performance issues that administrators hoped with training she could conquer," but "Resh did not

31

improve as was hoped." (Italics added.) As in *Sandell*, the District's own evidence is (at best) in conflict and does not compel *only* the District's interpretation of Resh's performance evaluations. On our de novo review, we conclude that one can reasonably find from Resh's evaluation reports that her performance was "overall, quite positive," casting doubt on the veracity of the District's claim it did not rehire Resh because of performance issues. (*Sandell*, *supra*, 188 Cal.App.4th at p. 316.)

Over the course of her three years of teaching at Sage Canyon, Resh received three end-of year Evaluation Summary reports. In each of them, Cameron and Fieberg gave Resh the highest possible rating of "Meets or Exceeds District Requirements." Virtually all of the assertedly negative feedback relied on by the District comes from Resh's twice-yearly Evaluation Reports relating to her formal observations, and more specifically from the section of these reports set aside for "Suggestions for Improvements Regarding Instructional or Professional Standards." (Capitalization omitted.) A jury could reasonably infer from the fact that the form reports included a section dedicated to providing suggestions for improvements that providing constructive criticism was a routine part of the evaluation process, and did not indicate a teacher who received such suggestions was a subpar instructor.

Moreover, viewed in context, the suggestions for improvement highlighted by the District do not convey that Resh's overall performance was considered deficient. For example, the District points to the fact that in his January 2016 Evaluation Report, Cameron "wrote that Resh's students were not clear on what was being asked of them in a particular task, and seemed confused." Yet a review of the entire Evaluation Report reveals it to be largely positive. Cameron complimented Resh for "[t]he success of [her] set" and identified a number of ways in which her reading lesson was effective.

32

Cameron's only suggestion for improvement related to a single question within Resh's 45-minute lesson in which she asked students, "[H]ow can this strategy help you when you are reading?" Cameron thought the students "seemed confused by use of the word 'strategy.'" Cameron's constructive feedback about a single word choice during a lesson that he otherwise viewed as successful fails to convey that the suggestion reflected a concern about Resh's abilities as a teacher.

The District also relies on Cameron's end-of-year Evaluation Summary from April 2016, in which he stated Resh's "area of growth for next year will be to work on the social/emotional side of the child and look to build more inter-personal relationships with her students." But the District overlooks that the report is otherwise filled with Cameron's commendations of Resh's successes that year, including his observation that she had "shown great progress and accomplishments in her teaching," had "developed successful and collaborative relationships with her first grade team, her students, and their parents," had "invested time to connect with her students to better understand their varied academic backgrounds," and that "[e]ach of [Resh's] students has made significant academic gains in their reading levels, writing skills, and math concepts." And any inference that Cameron viewed the "area of growth" as a professional shortcoming is countered by the fact that in the same Evaluation Summary, he gave her the highest rating of "Meets or Exceeds District Requirements" and recommended the District rehire her for the following school year.

The other suggestions for improvements in Resh's evaluations relied on by the District likewise stand in contrast with Cameron and Fieberg's overall feedback, which was positive. The District points to Fieberg's January 2017 Evaluation Report, in which Fieberg suggested Resh needed to check the

answers of every student to "see who is correct and who may need more support." Fieberg's evaluation of Resh was otherwise enthusiastic. In describing the effective aspects of Resh's lesson, she complimented Resh's clarity in developing and conveying the "learning objective" to her students, punctuating her positive comments with the compliment, "Nicely done!" Fieberg also stated in the April 2017 Evaluation Report that Resh had effectively "monitored student progress" and so was "able to support a few students who chose an incorrect operation." So it appears that Resh had incorporated Fieberg's previous suggestion to check all students' answers. Fieberg's only suggestion for improvement in the April 2017 Evaluation Report related to the students' use of a white board that she believed other students found difficult to see. This suggestion hardly conveys an insurmountable performance problem. Countering any inference that these few suggestions for improvements reflected the sort of performance concern that could lead to an adverse employment decision was the fact that Fieberg also gave Resh the highest possible rating in her 2017 end-of-year Evaluation Summary. Fieberg found Resh's performance in her second year at Sage Canyon "Meets or Exceeds District Requirements."

As for Resh's third year, the District notes that Cameron, in his January 2018 Evaluation Report, suggested for improvement that some of Resh's students might have benefited from additional modeling on how to create a "graphic organizer" and that they may also have benefitted from "practice on how to take turns and be a good listener and presenter." In his April 2018 Evaluation Report, Cameron stated that during a peer-to-peer share session, some students had "challenges finding a peer and effectively communicating their strategy" and suggested that modeling expectations for the share sessions "may help students be more successful in the future." But

again, in emphasizing Cameron's suggestions for improvement, the District ignores his positive comments.  In his January 2018 Evaluation Report, Cameron said Resh had been "especially effective" in establishing the lesson's objectives and in "engaging [her] students in the lesson through active participation."  (Capitalization omitted.)  Cameron's positive feedback from his April 2018 Evaluation Report included that Resh had been effective in checking her students' understanding, that she had helped them "remain engaged" and had "set[ ] them up for success" when working independently.  Again, any inference that Cameron's comparatively modest suggestions conveyed dissatisfaction with Resh's overall performance is countered by his end-of-year Evaluation Summary from May 3, 2018, the same day he told Resh her contract was not being renewed.  He again gave her the highest possible rating, "Meets or Exceeds District Requirements."

As additional reasons for not rehiring Resh, the District points to Fieberg's testimony that she had concerns about Resh's relationships with students and parents; noticed during some of Resh's interactions with students that she seemed cold, short, or frustrated; was concerned by Resh's comment that she hoped her students would continue reading quietly for as long as possible; and felt that Resh's teaching style was mechanical.  The District also points to Cameron's testimony that during one of Resh's third-year observations, he saw Resh read from a script, which he found unprofessional.  It contends that Cameron and Fieberg's opinions of Resh led them to consistently rank her near the bottom of Sage Canyon's temporary teachers.

However, Resh points to evidence challenging the veracity of Fieberg and Cameron's claims that the performance problems they identified were the real reasons she was not rehired, or that the performance problems were

even true. She points out that section 11.1 of the collective bargaining agreement between the District and the teachers' union stated that periodic evaluations are "essential" both to "assist teachers in developing competency" and to enable personnel decisions to be made in a "just and equitable manner." Under section 11.7.4 of the collective bargaining agreement, "[i]n the case of negative evaluation(s), or if any problems are noted," the evaluator is *required* to "take positive action to develop a written assistance plan which will assist the [teacher] in correcting any cited deficiencies." But neither Cameron nor Fieberg noted the problems they articulated during their depositions in any of their written evaluation reports, nor did they develop written assistance plans to help Resh respond to and correct the alleged deficiencies. As Resh persuasively argues, a jury could reasonably infer that Cameron and Fieberg complied with the collective bargaining agreement, and that their failure to develop a written assistance plan to address any perceived problems with Resh's frustration, coldness, or reading from a script, suggests the problems either did not exist or were not contemporaneously considered serious enough to warrant an adverse employment decision.

Resh also presented evidence directly countering Cameron and Fieberg's testimony about her performance problems. While Cameron claimed to have told Resh in an informal conversation that her classroom seemed overly structured, Resh specifically denied that such a conversation occurred. As for Cameron and Fieberg's claims that Resh displayed insufficient growth or development as a teacher, one could reasonably conclude their formal evaluations of Resh over her three years at Sage Canyon belie those claims. For example, in Cameron's end-of-year Evaluation Summary report for Resh's final year, he found that Resh had

36

"stretch[ed] her thinking [and] teaching this year" and had implemented new teaching techniques into her classroom "with success." Resh also provided copies of the informal handwritten notes she received from Cameron and Fieberg during their respective evaluation periods. In one, Cameron complimented her for putting her "training [into] practice," and in another, Fieberg said Resh's "classroom is full of evidence of student learning" and told Resh, "Sage Canyon is lucky to have you!" Resh also submitted copies of Cameron and Fieberg's letters of recommendation, in which they both lauded her performance at Sage Canyon. Cameron, in particular, said Resh's "competence as a teacher, work ethic, organization, ability to work with others, and ability to support students' academic, social and behavioral development have been impressive."

Resh also offered evidence disputing the veracity of Fieberg and Cameron's claims that she struggled to build positive relationships with parents and students. She provided copies of thank-you notes from parents. In one note, a parent called Resh "responsive, caring, and sensitive." In another, Resh was told, "I could feel your kindness to me who is not good at English." And in yet another, Resh was thanked for "all the energy, love and positivity [she] put into the classroom everyday." Resh also submitted a copy of a letter sent to her by a local doctor's office telling her that one of its patients had entered her in a " 'My Favorite Teacher' " contest. And she provided copies of dozens upon dozens of handwritten expressions of gratitude from her students that conveyed such sentiments as, "You are my favorite teacher that I ever had in my life," "You are very nice," "You are fun, respe[c]tful, and loving," and "I love being your student." The District discounts the probative value of Resh's evidence, asserting the notes Resh received from parents simply showed there were "third parties who liked

Resh" and that it does not dispute Resh was "likable." This ignores, of course, that one of its own professed reasons for not rehiring Resh was that "Fieberg . . . had concerns about Resh's relationships with students *and parents*." (Italics added.)

The District additionally contends that Fieberg's testimony that Resh was a "good teacher" but not the "best"; Cameron's alleged assertion that Resh should not be brought back because her "observations [were] not good"; and Romero's testimony that Resh was "not a rock star," all established legitimate reasons for the decision not to offer her a fourth teaching contract. But, as we have discussed, Resh presented credible evidence to place the District's evidence in dispute, including her testimony that she never received any such criticism while she was employed at Sage Canyon, and no such complaints are reflected in her written performance evaluations. As in *Sandell*, a reasonable person could infer that at the time the adverse employment decision was made the District "did not have the kind of feedback about [Resh's] performance that [it] now suggest[s] was the impetus for [not rehiring her]." (*Sandell, supra*, 188 Cal.App.4th at p. 317.)

Finally, Resh relies on the timing of the rehiring decision as an additional factor supporting an inference of discriminatory motive. Although "temporal proximity *alone* is not sufficient to raise a triable issue as to pretext" (*Arteaga, supra*, 163 Cal.App.4th at p. 353, italics added), it can still serve, along with other factors, as circumstantial evidence of pretext (see *Sada v. Robert F. Kennedy Med. Ctr.* (1997) 56 Cal.App.4th 138, 156–157; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 478). Here, Resh averred in her declaration that although she understood she was not guaranteed continuing employment as a temporary teacher, Romero told her that *unless* she did something unlawful, the District experienced declining

38

enrollment that eliminated the need for temporary teachers, or her performance was substandard, she could expect to be rehired each subsequent year. She further averred she did nothing unlawful during her time at Sage Canyon, and there were no issues with declining enrollment that reduced the school's need for temporary teachers in the 2018-2019 school year. Further, while she was teaching at Sage Canyon, neither Cameron nor Fieberg ever told her they thought her performance was substandard, that they found her teaching style overly rigid, or that they believed she was struggling to build positive relationships with her students. And yet, after she told Cameron that she was pregnant, she was told just one month later that her contract would not be renewed. And when she asked why, Cameron told her the reason was that she "was not moving in the same direction as the school or the District" and "was not a good fit." A jury could reasonably infer discriminatory motive from the timing of the adverse employment decision, as well as the vague reasons offered to justify it.

In the end, what we said in *Sandell* applies here: "The fact that the parties argue extensively about a number of factual issues," including whether Resh was successful in forming relationships with students and parents; whether her formal evaluations were entirely positive or instead reflected ongoing, unaddressed concerns about her performance; whether her teaching style was perceived to be overly rigid and whether this was communicated to her; and whether her assertedly low ranking reflected performance issues and justified the rehiring decision, "demonstrates why this case is not an appropriate one for summary judgment and instead should be heard by a jury." (*Sandell, supra*, 188 Cal.App.4th at p. 319.) Here, as in *Sandell*, the evidence is such that a fact finder could reasonably conclude the District's proffered reasons for the decision to not rehire Resh "were

39

unworthy of credence and, based on that conclusion, infer those reasons are not the real reasons" for the adverse employment decision, and that those reasons were a pretext for pregnancy discrimination.[7] (See *id.* at pp. 315, 319.) This evidence, coupled with the evidence of the timing of the District's decision, is sufficient to raise a triable issue of fact that the decision was motivated by discrimination. (See *Guz, supra,* 24 Cal.4th at p. 356 ["In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias."].) We conclude that Resh's evidentiary showing "is sufficient to preclude a determination that, as a matter of law, [the District] is entitled to judgment in its favor at this point in the litigation." (*Sandell,* at p. 319.)

C.   *We Need Not Consider Whether Resh's Pleadings Encompassed a Theory of* In Vitro *Fertilization Discrimination*

In the trial court, in an effort to save her discrimination claims from being summarily adjudicated based on the District's claim Cameron's rehiring decision was made on or about March 9, 2018, Resh sought to rely on her January 2018 disclosure of her *in vitro* fertilization procedure to Cameron

---

7     The parties dispute whether, as part of our review, we must consider for the first time on appeal whether Resh met her initial burden of establishing a prima facie case of discrimination, even though the District's motion assumed Resh could establish a prima facie case, and even though this issue was not briefed or argued in the trial court. Assuming without deciding that we must do so, we conclude Resh has met this burden, which is " 'not onerous.' " (*Guz, supra,* 24 Cal.4th at p. 355; see *ibid.* [discussing elements of prima facie case].) The evidence discussed here substantiated both Resh's prima facie case and her showing of discriminatory motive. (See *Kelly v. Stamps.com, Inc.* (2005) 135 Cal.App.4th 1088, 1101, fn. 10.)

as the relevant disclosure that motivated Cameron's decision.[8]  The District argued, and the trial court agreed, that Resh could not rely on her *in vitro* fertilization efforts to avoid summary adjudication of her discrimination claims, because this theory of discrimination was not alleged in her complaint.

On appeal, as an alternative ground for reversing the judgment, Resh argues her complaint, broadly construed, did encompass a theory of discrimination on the basis of her *in vitro* fertilization procedure.  However, she asserts in her reply brief that this issue is "only relevant" to the extent this court concludes the evidence fails to raise a triable issue of fact as to whether Cameron made the adverse employment decision after Resh disclosed her pregnancy to him.  In essence, if we were to affirm the trial court's ruling that Cameron made his decision before learning Resh was pregnant, the *in vitro* fertilization disclosure would be the only disclosure supporting Resh's discrimination claims.  In that case, it would become necessary for us to consider whether Resh's complaint, as drafted, encompassed this theory.  But since we have concluded the trial court erred in granting summary judgment as there are genuine factual disputes surrounding the timing of Cameron's adverse employment decision, we need not consider whether Resh's pleadings encompassed a theory of discrimination based on her *in vitro* fertilization procedure.

## DISPOSITION

The judgment is reversed.  On remand, the trial court shall enter an order granting the District's motion for summary adjudication of the

---

[8]    Resh did not seek leave of the trial court to amend her complaint to add a theory of *in vitro* fertilization discrimination.

complaint's fourth cause of action for retaliation as well as its prayer for punitive damages, and otherwise denying the District's motion for summary judgment or summary adjudication.  Resh shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)–(3).)

DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


IRION, J.